In re KNM ROSWELL LIMITED PARTNERSHIP, an Illinois Limited Partnership, Debtor.

Bankruptcy No. 90 B 4695.

United States Bankruptcy Court, N.D. Illinois, E.D.

April 16, 1991.

Holleb & Coff, H. Stein, C. Horvay, D. DeLaurent, Chicago, Ill., for KNM Roswell Limited Partnership.

Greenberger, Krauss & Jacobs, T. Conway, J. Mrowiec, Chicago, Ill., for Phoenix Mut.

Coffield, Ungaretti, Harris & Slavin, T. Eaton, S. Alsterda, Chicago, Ill., for Krupp Corp.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on the Plaintiff's Motion For Sequestration Of Rents And Cash Collateral And Order Prohibiting Use of Rents And Cash Collateral. In addition there are two other motions related to the above captioned debtor, which are before the Court: 1) The Motion of the Krupp Corporation for Allowance and Payment of Administrative Expenses and Other Relief; and 2) Holleb & Coff's First Interim Application for Allowance of Attorney's Fees and for Reimbursement of Expenses. Because the adjudication of these two motions is in part dependent upon the resolution of Phoenix Mutual's sequestration motion, they are also being considered here.

The Court, having considered the record, the pleadings on file, and the memoranda submitted by the parties, now renders its decision.

## FINDINGS OF FACT

Phoenix Mutual Life Insurance Company [Phoenix Mutual] holds a non-recourse promissory note [the Note] dated September 19, 1984, and executed by Roswell Mall, Inc. [RMI] and the Krupp Commercial Properties Limted Partnership [KCPLP]. The Note is secured by a mortgage [the Mortgage] on an enclosed shopping mall in Roswell, New Mexico [the Roswell Mall]. At the time the Note and the Mortgage were executed KCPLP owned the Roswell Mall. The original principal amount of the Note was $11,825,000, but Phoenix Mutual has advanced only $11,000,000 of that amount. Phoenix Mutual is also the assignee under an Assignment of Leases and Rents [the Assignment] which further secures the Note. Both the Mortgage and the Assignment were recorded in Chaves County, New Mexico in September of 1984.

KCPLP ceased making mortgage payments to Phoenix Mutual in September of 1989 and thus defaulted under the terms of the Note. In December of 1989, in response to a number of factors which are not relevant to this opinion, the Debtor, KNM Roswell Limited Partnership [KNM], was formed and the Roswell Mall was transferred to KNM.

On February 27, 1990, Phoenix Mutual filed a Complaint to Compel Payments, for Specific Performance of Assignment and for Appointment of Receiver in the United States District Court for the District of New Mexico (the "New Mexico Action"). The complaint in the New Mexico Action named as defendants KCPLP, KNM and the ground lessor. KNM was served with the complaint and required to answer or otherwise plead by March 20, 1990. On March 13, 1990 KNM filed its petition for reorganization in this Court. In response Phoenix Mutual filed the instant motion as well as a motion to dismiss, for relief from the stay and other relief. In a prior opinion and order the Court denied the relief sought by Phoenix Mutual in the motion to dismiss.

## CONCLUSIONS OF LAW

I. Phoenix Mutual's Motion For Sequestration Of Rents And Cash Collateral And Order Prohibiting Use of Rents and Cash Collateral

Phoenix Mutual contends in its motion that it has a secured interest in the rents, issues and profits of the Roswell Mall. That interest, argues Phoenix Mutual, must be protected. Based on the following analysis, this Court concludes that Phoenix Mutual is correct.

There has been considerable controversy over the effect of a bankruptcy filing on the ability of assignees of rents to reach those rents. Adhering to the Supreme Court's decision in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the courts have agreed that state law determines the existence and

extent of a security interest in rents in bankruptcy cases. *Matter of Village Properties, Ltd.*, 723 F.2d 441 (5th Cir. 1984), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *In re Casbeer*, 793 F.2d 1436 (5th Cir.1986); *In re Prichard Plaza Associates Limited Partnership*, 84 B.R. 289 (Bkrtcy.D.Mass.1988); *In re Woodstock Associates I, Inc.*, 120 B.R. 436 (Bkrtcy.N.D.Ill.1990); *Matter of Gotta*, 47 B.R. 198 (Bkrtcy.W.D.Wisc.1985). But tremendous disagreement has arisen as to how state law rights to rents play out in bankruptcy.

Typically under state law, an assignee who has previously recorded an assignment of rents may, upon default by the assignor, obtain the rents by taking possession of the property which is producing the rents or by having a receiver appointed to administer that property. There is little question that if, prior to the filing of the bankruptcy petition, the assignee has met all of the state law prerequisites for obtaining possession of the rents, then the assignee's right to the rents will be recognized in the ensuing bankruptcy case. *See, e.g., In re Foxhill Place Associates*, 119 B.R. 708 (Bkrtcy.W.D.Mo.1990); *In re Woodstock Associates I, Inc., supra; In re Prichard Plaza Associates Limited Partnership, supra.* The controversy arises when the debtor files a bankruptcy petition before the assignee has taken possession of the property or had a receiver appointed. In these circumstances bankruptcy courts are faced with the dilemma of applying state law in a situation where the automatic stay prevents the assignee from taking the necessary steps under state law to obtain possession of the rents. In other words these courts must apply state law where state law is not allowed to operate.

In its ruling in *Butner* the Supreme Court attempted to explain how state law should be applied. In that case the Court was faced with a circuit split. A number of circuits had held that in bankruptcy an assignee's interest in rents must be determined according to state law. The Third and Seventh Circuit Courts, on the other hand, had held that when a mortgagor filed a petition in bankruptcy, the assignee of

rents had a right to rents as a matter of federal law. According to these two circuits, "since the bankruptcy court has the power to deprive the mortgagee of his state-law remedy, equity requires that the right to rents not be dependent on state-court action that may be precluded by federal law." 440 U.S. at 53, 99 S.Ct. at 917. The Supreme Court rejected the view of the Third and Seventh Circuits:

It does not follow ... that all mortgagees be afforded an automatic security interest in rents and profits when state law would deny such an automatic benefit and require the mortgagee to take some affirmative action before his rights are recognized. What does follow is that the federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued. ... The rule of the Third and Seventh Circuits, at least in some circumstances, affords the mortgagee rights that are not his as a matter of state law. The rule we adopt avoids this inequity because it looks to state law to define the security interest of the mortgageee. At the same time, our decision avoids the opposite inequity of depriving a mortgagee of his state-law security interest when bankruptcy intervenes. For while it is argued that bankruptcy may impair or delay the mortgagee's exercise of his right to foreclose, and thus his acquisition of a security interest in rents according to the law of many States, a bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclosures.

*Butner*, 440 U.S. at 56–57, 99 S.Ct. at 918–19. Unfortunately, this explanation has not proven to be especially helpful to the courts and the cases that have followed *Butner* have struggled in applying it's teachings.

Some courts have taken a narrow view of the rule that state law determines the rights of assignees to rents in bankruptcy.

In *Matter of Gotta, supra,* the court held that if the right to rents was not complete under state law before the bankruptcy case was filed, section 362(a)(4) and (5) stayed the mortgagee from completing those steps unless and until the stay was modified. *Id.* at 201.[1]

Other courts have held that at least where the state law in question required only some perfunctory step such as notice before the right to rents was complete, that step could be taken after the bankruptcy case was filed, especially when the notice was given in connection with a request for relief in the Bankruptcy Court. Thus in *In re Morning Star Ranch Resorts,* 64 B.R. 818 (Bkrtcy.D.Colo.1986), the filing of a complaint to prohibit use of cash collateral was found to be sufficient to complete the necessary steps. In *In re Sampson,* 57 B.R. 304 (Bkrtcy.E.D.Tenn.1986), a complaint to determine the validity of the assignee's lien was sufficient.

In *In re Gelwicks,* 81 B.R. 445 (Bkrtcy.N. D.Ill.1987), the court held that a motion to modify the automatic stay was sufficient to obtain the rents even though state law required actual possession or actual appointment of a receiver. The court was able to reach this result by invoking § 546(b). This subsection allows a creditor to perfect a security interest post petition, by giving notice, if the applicable state law provides that perfection of that security interest relates back to some earlier time.[2] According to the *Gelwicks* court, if state law requires possession or appointment of a receiver before the mortgagee has a right to rents, an assignee does not perfect his interest in rents except by acquiring pos-

session of the property which produces the rents or by getting a receiver appointed to administer that property. And this perfection is effective against prior lienholders. Consequently, § 546(b) permits an assignee to "perfect" his interest by giving notice. The giving of notice under § 546(b) does not violate the automatic stay because of § 362(b)(3).

■ The *Gelwicks* approach would be an efficient way of resolving the issue at hand if a security interest in rents were in fact perfected in the manner described by the court in that case. But this Court finds more compelling the approach taken in those cases which hold that a security interest in rents is perfected at the time the assignment of rents is recorded. *In re Park at Dash Point, L.P.,* 121 B.R. 850 (Bkrtcy.W.D.Wash.1990); *In re Foxhill Place Associates, supra. See also, In re Prichard Plaza Associates Limited Partnership, supra* (The court here holds that where all the necessary state law steps have not been taken the lien on rents is perfected but inchoate. Therefore, the court concludes that the assignee does not have a security interest in the rents). As the court explained in *In re Park at Dash Point, L.P., supra:*

> [P]erfection ... means the process by which the security interest ... achieves a status where it cannot be avoided by an intervening third party.

"Perfection" is thus a concept involving the relative interests of the lien-holder and an intervening third party. It does

---

1. Sections 362(a)(4) and (5) state:
   (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay applicable to all entities, of—

   (4) any act to create, perfect, or enforce any lien against property of the estate;
   (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title.

2. § 546(b) provides:

The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

not deal with the relationship between the debtor and the secured party, or between the secured party and the collateral property. Those latter relationships raise only the question of "enforcement" of the security interest.

*Dash Point*, 121 B.R. at 853 (Quoting McCafferty, *The Assignment of Rents in the Crucible of Bankruptcy*, 94 Com.L.J. 433, 471–472). Acquiring possession, obtaining the appointment of a receiver, or taking whatever other steps are necessary under state law to obtain the rents, involves the relationship between the debtor and the secured party. It therefore constitutes enforcement. Assignments of rent are recorded in order to give notice to third parties. Therefore, assignments of rent are perfected upon recordation.

The *Dash Point* court also explains what has misled courts into thinking that enforcement is perfection:

The relationship between the timing of enforcement and the specific rents to which the mortgagee is entitled, has engendered the description of security interests as either "choate" or inchoate." Functionally, these designations have depended on whether a security interest in rents had been enforced by one of the permitted enforcement mechanisms (possession or the appointment of a receiver); the interest was termed "inchoate" if it was as yet unenforced, and therefore the mortgagee's interest in the rents remained prospective, not yet having risen to the level of the actual right to collect the rents. The mortgagor is entitled to any rents paid while the assignment remains unenforced, or "inchoate."

Regardless of the timing of enforcement, the recording of the assignment of rents perfects it ... As caselaw dealing with assigned rents has developed, the distinction between the concepts of perfection and enforcement has become blurred, leading to the association of the term "perfected" with the term "choate".

*Id.* at 855 (Citations omitted).

To be sure, assignments of rent do not fit neatly into the mold created to address perfection of other interests in property. Typically, when a creditor perfects a security interest, it obtains an interest in a specific piece of property. By contrast, when notice of an assignment of rents is recorded, the property being secured is of a contingent nature. The assignee obtains an interest in those rents which are to come due after the borrower defaults upon the obligation being secured and the assigneee then enforces his right to those rents.[3] Until the borrower defaults the assignee has no rights to the rents.

This unusual method of operation has led to confusion as to the effect of recording an assignment of rents. According to the court in *Matter of Gotta, supra:* "Perfection of a security interest in an assignment of rents has no retroactive effect. Unless the assignee perfects his/her interest in the rents and profits, a prior right in the rents may be acquired by a third person." [4] *Matter of Gotta,* 47 B.R. at 202. But *Gotta* tells only half the story. A prior right to those rents which come due before the borrower defaults and the assignee then enforces his rights, may be obtained by a third person. This is so because before that default and enforcement, the assignee has no rights to the rents. Thus, it necessarily follows that a creditor other than the assignee can obtain a right to them. However, once the original assignee enforces her right to the rents, her right to all rents coming due thereafter is superior to that of any lienholder who perfected his interest after the assignee recorded her assignment of rents. *American Bridge Co. v. Heidelbach,* 94 U.S. 798, 24 L.Ed. 144 (1876); *New York Trust Co. v. Shelburne,* 159 A. 522, (N.J. 1932), *aff'd,* 163 A. 892. *See also,* Com-

---

**3.** It is possible to create an assignment of rents which conveys rents to the assignee in a way which is not contingent upon the borrower's default. But that is not the type of assignment of rents we are dealing with here.

**4.** The *Gotta* court here is assuming that perfection takes place when the assignee takes action after the borrower's default to obtain the rents, i.e., it is calling perfection what this court has concluded is actually enforcement.

ment, *Interests in Collaterally Assigned Rents and Profits Under the Bankruptcy Code*, 22 Hous.L.Rev. 1251 (1985). If third parties, who obtained security interests in the rents subsequent to the assignee recording his assignment of rents, had a right superior to that of the assignee, there would be absolutely no point in recording an assignment of rents.

The following time line and the accompanying hypothetical illustrate the extent of the assignee's rights to rents.

```
--.------.-------.-----.------>
1/1/80      6/1/85      12/1/90
```

Suppose that time progresses on the above line from left to right and that creditor number one has recorded an assignment of rents on 1/1/80. Suppose further that the assignor of this assignment defaults on 12/1/90 and that, in accordance with the assignment, the creditor takes immediate possession of the property and begins collecting the rent. Under this scenario creditor number one has a right to all the rents coming due after 12/1/90, which right is superior to those of anyone who has not recorded a security interest in them before 1/1/80. Nonetheless, he has no right to any of the rents which came due between 1/1/80 and 12/1/90. If creditor number two records a security interest in the rents on 6/1/85 and immediately begins collecting those rents, creditor number one will have no basis upon which to recover any rents paid to creditor number two which came due before 12/1/90. But creditor number two's interest in the rents coming due after 12/1/90 will be inferior to that of creditor number one.

■ Accordingly, this Court adopts the reasoning of *Dash Point* and holds that an assignment of rents is perfected upon recordation. Although *Dash Point* deals only with Washington state law, the principles it articulates are of general applicability. Therefore, unless state law provides otherwise, the recording of the assignment of rents along with the remainder of the mortgage documents gives the mortgagee-assignee a perfected but inchoate lien on the rents. As a result that interest is subject to the adequate protection requirements of sections 362 and 363(b). The law which applies in the instant case is that of New Mexico. As the following analysis reveals, it is completely consistent with the reasoning of *Dash Point.*

The first problem one encounters when attempting to determine New Mexico law with respect to assignments of rent is that there is very little of it. With the exception of *First Savings Bank & Trust Co. of Albuquerque, N.M. v. Stuppi*, 2 F.2d 822 (8th Cir.1924), the Court has found no cases or statutes which deal directly with assignments of rent. And *First Savings Bank* is hardly dispositive.

The court in *First Savings Bank* faced the same issue the Court faces here—the effect of a bankruptcy filing on the efforts of an assignee of an assignment of rents to obtain a security interest in the rents covered by that assignment. But the facts differed from the instant case in important respects. The creditor in *First Savings Bank* filed for and obtained the appointment of a receiver after the filing of bankruptcy by the debtor. Only after the creditor had obtained this appointment did the Trustee intervene to stop the state court proceedings. In contrast to present practice, bankruptcy at that time worked in this way.

Thus, in *First Savings Bank* the creditor, not facing the automatic stay, took all the necessary steps under state law in order to obtain the rents. Under these circumstances, the court's holding that the creditor had a secured interest in the rents does not tell us anything about the present case. The problem with which this Court is faced is determining what to do when the automatic stay has prevented the creditor from taking the necessary state law steps. Moreover, *First Savings Bank* would not be a very helpful case for the purposes of determining New Mexico law even if it were directly on point. The court there begins its analysis of the assignments of rents issue by remarking that no applicable New Mexico cases had been brought to its attention. It then goes on to rely on cases having nothing to do with New Mexico law.

■ Due to this paucity of law directly on point the Court turns to New Mexico law with respect to recording instruments which affect title to real property. N.M. Stat.Ann. § 14–9–1 (1978, rev. 1990) provides: "All deeds, mortgages, United States patents and other writings affecting the title to real estate, shall be recorded in the office of the county clerk of the county or counties in which the real estate affected thereby is situated." § 14–9–2 continues: "Such records shall be notice to all the world of the existence and contents of the instruments so recorded from the time of recording." And § 14–9–3 concludes in relevant part: "No deed, mortgage or other instrument in writing not recorded in accordance with Section 14–9–1 NMSA 1978 shall affect the title or rights to, in any real estate, of any purchaser, mortgagee in good faith or judgment lien creditor, without knowledge of the existence of such unrecorded instruments."

Taken together, these statutes virtually compel the conclusion that assignments of rent are covered by § 14–9–1 and, consequently, are perfected at the time of recording.

■ In order for § 14–9–1 to apply to assignments of rent, the phrase "other writings affecting the title to real estate," must include assignments of rent. On its face this phrase does appear to cover them. Assignments of rent certainly have an effect on title to real estate. A rather important attribute of ownership of commercial real estate is earning income from that real estate.

Nevertheless, the effect of an assignment of rents on title is indirect and looking at § 14–9–1 alone it is conceivable, though unlikely, that the New Mexico legislature did not intend them to be covered. However, this possibility becomes rather remote when one considers § 14–9–3. § 14–9–3 says that if a written instrument is not recorded in accordance with § 14–9–1 it shall not affect the title *or rights to* in any real estate of any purchaser without knowledge of the unrecorded instrument. One of these rights must certainly be the right to receive rent from one's property.

And if rents are covered by § 14–9–3, the assignee of an assignment of rents would be left in an impossible situation were he not to record his assignment pursuant to § 14–9–1. For under § 14–9–3 his failure to record would make his assignment almost totally ineffective. Thus, though it is unclear why § 14–9–1 does not have the same language as § 14–9–3, it is clear that in order for these statutes to operate in a way which is not completely absurd and totaly unfair, § 14–9–1 must be read to include everything which is covered by § 14–9–3. *See, Cano v. Lovato,* 105 N.M. 522, 734 P.2d 762, 769 (N.M.App.1986), *cert quashed,* 104 N.M. 246, 719 P.2d 1267 (1986) (Supports the proposition that New Mexico's recording act, unless the plain language of the statute provides otherwise, will not be read in a way which leads to an unfair result.); *Jeffers v. Doel,* 99 N.M. 351, 658 P.2d 426, 427–428 (1982) (Quoting *Jeffers v. Martinez,* 93 N.M. 508, 510, 601 P.2d 1204, 1206 (1979), the court holds that conflicts between N.M.Stat.Ann. § 40–3–13(A) (1978) and § 14–9–3 should be resolved in favor of the latter statute, because to do otherwise would be unfair). Therefore, assignments of rent are covered by § 14–9–1.

■ Finally, it is clear that the effect of recording an assignment of rents pursuant to § 14–9–1 is to perfect one's interest in the rents covered by that assignment. As was discussed earlier, perfection of a security interest occurs when one gives notice to third parties of one's security interest by recording that interest. § 14–9–2 explicitly states that § 14–9–1's purpose is to provide a mechanism to give third parties notice of the instruments recorded. Moreover, the effect of this notice is to give the recording party an interest in the land as of the date of that recording. As § 14–9–3 states, unrecorded interests are not valid against unknowing purchasers. To provide otherwise would lead to injustice against innocent parties who would obtain an interest in the land without knowledge of these instruments. *Arias v. Springer,* 42 N.M. 350, 78 P.2d 153, 159 (1938); *Cano v. Lovato, supra, Jeffers v. Doel, supra.* By implication, recorded

interests are recognized as of the date of their recording. This rule is fair both to the recording party and potential purchasers.

■ Having established that New Mexico law conforms to general state law principles with respect to assignments of rent, the Court will apply the reasoning of the court in *Dash Point* to the facts of the instant case. These facts are very simple. Phoenix Mutual is the assignee of an assignment of rents which was recorded prior to KNM's bankruptcy filing. Prior to this filing Phoenix Mutual filed a complaint to have a receiver appointed to administer the Roswell Mall. Before this complaint was ruled upon, KNM filed bankruptcy. Filing a complaint to have a receiver appointed is not sufficient under New Mexico law to obtain the rents in question.[5]

■ Accordingly, Phoenix Mutual has a perfected, but inchoate security interest in the rents from the Roswell Mall as of the date of KNM's bankruptcy filing. The rents therefore constitute cash collateral under 11 U.S.C. § 363(a) and as such, pursuant to § 363(c)(2), KNM may not use that cash collateral unless Phoenix Mutual consents or the Court authorizes such use. The Order Regarding Payment of Operating Expenses entered on July 10, 1990 constitutes limited consent by Phoenix Mutual as well as the Court's view as to KNM's rights pursuant to § 506(c).

## II. Motion of the Krupp Corporation for Allowance and Payment of Administrative Expenses and Other Relief

The Krupp Corporation, through its affiliate, the Krupp Realty Company, manages the Roswell Mall. In its motion the Krupp

Corporation seeks administrative expenses from the bankruptcy estate in the amount of $105,481.79. KNM has been unable to obtain Phoenix Mutual's consent, pursuant to the July 10, 1990 Order described above, to pay these expenses. According to the Krupp Corporation, through December 31, 1990, it has incurred this amount of expenses in managing the Roswell Mall.

■ The only assets in the bankruptcy estate which are available to pay the Krupp Corporation's claim are the post-petition rents from the Roswell Mall. KNM is holding a small amount of pre-petition rents, but these are insufficient, after the Debtor's attorney's fees are paid, (*see*, Section III of this Opinion, *infra*) to satisfy the Krupp claim. As held above, the post-petition rents constitute cash collateral under § 363(a). Consequently, the Court may only authorize their use by the Debtor subject to the restrictions of § 363(e) and § 506(c).

■ § 363(e) provides that KNM may not use any property which constitutes cash collateral unless it can give adequate protection to the party secured by that collateral. Other than rents, the only significant asset owned by KNM is the Roswell Mall itself. Therefore, Phoenix Mutual can only be adequately protected to the extent the Roswell Mall has a value sufficient to protect its secured interest in both the Mall and the rents earned by the Mall. But the Krupp Corporation has not offered any evidence as to the value of the Mall.[6] Pursuant to § 363(o) the Krupp Corporation has the burden of proof on the issue of adequate protection. Therefore, it may not receive any of the rents pursuant to this section.

---

5. Again, there is no New Mexico law on point with respect to the steps one must take in order to obtain rents. *But see, First Savings Bank, supra.* However, as we just saw, New Mexico law conforms to general state law principles with respect to assignments of rent. In most states an assignee can obtain the rents only after taking actual or constructive possession of the property which generates those rents, having a receiver appointed to administer that property, or by taking some similar legal action. Cohn, H. Miles, *Protecting Secured Creditors Against the Costs of Delay in Bankruptcy: Timbers of*

*Inwood Forest and its Aftermath,* 6 Bankr.Dev.J. 147 (1989). Merely filing a motion to have a receiver appointed does not lead to an assignee obtaining the rents. This motion must be granted.

6. Solely for the purpose of its Motion to Dismiss and its Motion for Sequestration, Phoenix Mutual stipulated that the value of the Roswell Mall was $14 million. With respect to the Krupp Corporation's Motion for Administrative Expenses, this stipulation is of no effect.

§ 363(e), however, is subject to an exception. Pursuant to § 506(c) KNM may spend the rents to preserve the value of Phoenix Mutual's interest in the Roswell Mall and future rents to be generated by the Mall. Under this section the party seeking to invoke it, in this case the Krupp Corporation, must prove that the expenditures in question are "(1) reasonable, (2) necessary, and (3) beneficial to the secured creditor." *In re Chicago Lutheran Hospital Association*, 89 B.R. 719, 727 (Bkrtcy. N.D.Ill.1988). *See also, In re Pullman Construction Industries, Inc.*, 107 B.R. 909, 941–942 (Bkrtcy.N.D.Ill.1989); *In re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d 546 (9th Cir.1987); *In re James E. O'Connell Co.*, 893 F.2d 1072 (9th Cir.1990); *In re Williamson*, 94 B.R. 958 (Bkrtcy.S.D.Ohio 1988); *Uni–Fin Corp. v. McCord Tire & Supply Co.*, 1991 WL 18480, 1991 U.S.Dist.Lexis 1564 (N.D. Ill.). In its motion Krupp argues that it has a claim for administrative expenses against KNM for $105,481.79, but it offers virtually no evidence as to why this expenditure was reasonable, necessary or beneficial to Phoenix Mutual. Krupp does tell us its claim consists of $85,374.62 for "payroll and related taxes/benefits," $2,716.09 for "travel and expenses reimbursements," and $17,391.08 for "insurance." But it provides nothing which either shows how it came up with those numbers or which corroborates them.[7]

In its Memorandum In Support of its Motion And In Reply to Phoenix Mutual's Objection, which was filed 9 days before the instant case was set for ruling, Krupp does at least give a rough breakdown of the expenses it has incurred. But even if one ignores the fact that this breakdown was not submitted in Krupp's original motion and Phoenix Mutual has therefore had no opportunity to respond to it, it does not come close to meeting Krupp's burden of proof. To begin with, the totals in the breakdown do no match those in Krupp's original motion. This discrepancy appears to have come about because the breakdown covers expenses through February of 1991, while the numbers in the motion were for expenses through December of 1990. Whatever the reason, however, Krupp certainly cannot meet its burden via inconsistent numbers which force the Court to engage in a guessing game. More importantly, even if the numbers matched perfectly, merely giving an unsubstantiated breakdown of expenses with no explanation as to their necessity or reasonableness is not very helpful to Krupp's case.

Consequently, Krupp's motion for administrative expenses is denied to the extent that Krupp seeks payment from post-petition rents.

### III. Holleb & Coff's First Interim Application for Allowance of Attorney's Fees and for Reimbursement of Expenses

Pursuant to 11 U.S.C. § 331 Holleb & Coff, the law firm representing KNM, has filed an interim application for attorney's fees and for reimbursement of expenses. Holleb & Coff requests $164,820.50 in fees and $13,581.23 in expenses, with a $40,000.00 retainer presently held by them to be applied against these fees and expenses.[8] For the following reasons the Court grants Holleb & Coff's application but prohibits payment of those fees and expenses from post-petition rents.

Interim fees are payable to debtors' attorney's pursuant to 11 U.S.C. § 331. This section provides simply that the Court may allow such fees to be paid. It does not set forth any explicit guidelines as to how the Court must make this decision. It is clear, however, that § 331 does not permit the Court to allow fees to be paid in a manner which would conflict with other sections of the Code. As the "Historical and Revision Notes" to § 331 state:

---

7. There are some financial reports pertaining to KNM's income and expenses which are attached as an exhibit to Krupp's motion. But on their face they have no relationship to Krupp's claim. If they do have some hidden significance Krupp has failed to point it out to the Court.

8. In its response to Phoenix Mutual's objection to it application Holleb & Coff waived its request for word processing expenses in the approximate amount of $2,700.

The only effect of this section is to remove any doubt that officers of the estate may apply for, and the court may approve, compensation and reimbursement during the case, instead of being required to wait until the end of the case, which in some instances may be years.

Quoted in *In re Energy Cooperative, Inc.,* 55 B.R. 957 (Bkrtcy N.D.Ill.1985). Consequently, due to the status given secured creditors by the Code, attorney's fees cannot be paid at the expense of the secured creditor. Generally, with respect to assets which secure the secured creditor's claim, attorney's fees will be paid only to the extent the value of those assets exceeds the amount of the secured creditor's claim. *In re American Resources Management Corp.,* 51 B.R. 713 (Bkrtcy.D.Utah). Only if the attorney's services benefitted the secured creditor will attorney's fees be paid using assets which would otherwise belong to the secured creditor. 11 U.S.C. § 506(c). *See also, In re Flagstaff Foodservice Corp.,* 739 F.2d 73 (2nd Cir.1984).

Thus, in *In re Flagstaff Foodservice Corp., supra,* the secured creditor had a superpriority claim to those assets of the bankruptcy estate which were available to make an award of interim attorney's fees. The court found that the value of those assets was less than the amount of the secured creditor's claim. As a result of this finding the court held that interim attorney's fees would not be paid unless the attorney's services, pursuant to 506(c), benefitted the secured creditor. Finding that the attorney's services did not benefit the secured creditor, the court denied the application for attorney's fees.

In cases where the value of secured collateral is unclear the prevailing view is that interim attorney's fees will be paid using secured assets if it is likely that there will be sufficient assets left in the estate at the end of the bankruptcy to cover the attorney's fees and the claim of the secured creditor. *In re American Resources Management Corp., supra; In re Energy Cooperative, Inc., supra; In re Hall Nestletree II Associates. But See, In re Tri–County Water Association, Inc.,* 91 B.R. 547 (Bkrtcy.D.S.D.1988) (Holding that attorney's fees may not be paid from an undersecured creditor's collateral.).

The Court has located only one case which may be inconsistent with *Flagstaff* and the other cases above. In *In re Callister,* 15 B.R. 521 (Bkrtcy.D.Utah 1981), *appeal dismissed,* 673 F.2d 305 (10th Cir. 1982), the court held that interim attorney's fees would be paid in spite of the fact that a superpriority lien had not yet been satisfied. There is a presumption, said the court, that attorney's fees will be paid notwithstanding the existence of a superpriority. This presumption is rebuttable under appropriate equitable circumstances which the court found not to be present in the case upon which it was ruling.

At least one court has interpreted *Callister* as allowing "payment of interim fees even when there are no unencumbered assets available in the estate." *In re Hall Nestletree II Associates,* 112 B.R. 201, 202 (Bkrtcy.S.D.Tex.1989). But although the court's language in *Callister* clearly leaves open the possibility that it agrees with such a proposition, it is not what the court held. In its discussion of the attorney's fee issue the *Callister* court does not address the question of whether there are enough assets to satisfy both the superpriority and the award of attorney's fees. As the court in *In re American Resources Management Corp., supra,* points out, the *Callister* court found that the debtor in that case had $323,122.00 in unencumbered assets. Given the lack of discussion of this issue, it is hard to say whether the holding of the *Callister* court was predicated upon the existence of these unencumbered funds.

In any event, to the extent *Callister* does stand for the proposition that attorney's fees can be paid at the expense of the secured creditor, it is incorrect. There is no justification for the conclusion that § 331 acts to override the Code's protection of secured creditors. To justify such a conclusion § 331 would have to say, at the least, something directly inconsistent with the rest of the Code's treatment of secured creditors. It does not come close to doing so.

In the instant case, as discussed previously, the value of the Roswell Mall has not been established. Consequently, it is impossible to say with any degree of certainty whether there are enough assets in the bankruptcy estate to cover the claims of Holleb & Coff and Phoenix Mutual. Given this lack of certainty, the Court will not allow the use of secured assets, i.e., the Roswell Mall rents, for the payment of attorney's fees unless the services for which these fees were incurred benefitted the secured creditor. There is no evidence in the record that Holleb & Coff's services have benefitted Phoenix Mutual. To the contrary, Holleb & Coff's efforts have in large part been devoted to improving the debtor's position at the expense of Phoenix Mutual.

Accordingly, Holleb & Coff's interim fees and expenses may not be paid from post-petition rents. However, KNM is in possession of funds representing pre-petition rents. As was discussed earlier, prior to KNM's bankruptcy filing, Phoenix Mutual had not taken the steps necessary under New Mexico law to obtain those rents. *See supra* at p. 556, note 5. Therefore, they are not subject to Phoenix Mutual's security interest and are available for payment of administrative expenses, including interim fee and expense awards.