**In re WESTWOOD PLAZA APARTMENTS, LTD.,
Debtor.**

**Bankruptcy No. 91–41536A.**

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

Feb. 17, 1993.

E. Kathleen Shahan, U.S. Dept. of Justice, Civ. Div., Washington, DC, Wanda Cohen, Sp. Asst., Houston, TX, Ruth Harris Yeager, First Asst. U.S. Atty., U.S. Attor-

ney's Office, Tyler, TX, for U.S. Dept. of Housing and Urban Development.

Joyce W. Lindauer, Baskin & Novakov, P.C., Dallas, TX, for Westwood Plaza Apartments, LTD.

## MEMORANDUM OPINION

HOUSTON ABEL, Chief Judge.

Before the Court is the Final Application for Allowance of Compensation and Reimbursement of Expenses of Johnson, Bromberg & Leeds and Baskin & Novakov, P.C. The Department of Housing and Urban Development ("HUD") filed an objection to both Applications. HUD argued that the requested fees and expenses should be denied because Debtor's counsel represented both the Debtor and its general and limited partners during a deposition, thereby creating a conflict of interest, and because the assets in which payment would come from constitute HUD's cash collateral. At the hearing, the Court found that Ms. Lindauer's (Debtor's attorney) consultation with the general and limited partner of the Debtor during a deposition did not equate to representation of either the general or limited partner. Therefore, there is no conflict of interest to warrant a denial of fees. Further, the Court found that the fees and expenses incurred by both firms were reasonable and necessary. Accordingly, the Court approved the amount of compensation and reimbursement of expenses sought in both fee applications.

However, the Court took under advisement the issue as to whether the rents collected by the Debtor are cash collateral of HUD, and if so, may the Debtor use the cash collateral to pay the fees and expenses that are approved. After reviewing the arguments and the relevant case law, the Court is of the opinion the rents are HUD's cash collateral and that the Debtor may not use the cash collateral to pay the approved fees and expenses.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND

At the heart of this dispute are the loan documents—their meaning and effect. Particularly, the Court must determine whether or not the Regulatory Agreement and the Deed of Trust prohibit the Debtor from paying its attorneys with rents collected from tenants. HUD asserts that, pursuant to the assignment of rents provision in the Deed of Trust and the Regulatory Agreement, it is entitled to all rents collected once the Debtor defaulted on the mortgage note. As such, the rents, according to HUD, are HUD's cash collateral. The Debtor, on the other hand, asserts that the Regulatory Agreement required HUD to take some affirmative act following default before it is entitled to the rents.[1] Additionally, the Debtor asserts that even if HUD met the requirements under the Regulatory Agreement, the Debtor may still use the rents collected to pay its attorneys because HUD benefitted from the services the attorneys provided.

As with any dispute regarding loan documents, the starting point is the documents themselves. Regarding the Deed of Trust, the pertinent part provides:

4. That all rents, profits and income from the property covered by this Deed of Trust are hereby assigned to the holder of the Note for the purpose of discharging the debt hereby secured. Permission is hereby given to Grantor, so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement;

5. That upon default hereunder the holder of the Note shall be entitled to the appointment of a receiver by any court having jurisdiction, *without notice*, to take possession and protect the property

---

1. Debtor did not dispute that it had defaulted on the loan documents prior to its filing of bankruptcy.

described herein and operate same and the collect the rents, profits and income therefrom.

(Emphasis added). With the Regulatory Agreement, the corresponding section regarding the assignment of rents provides:

1. If the Owner violates any provisions of this Agreement, the Mortgagee or Secretary *may* send the Owner written notice of such violation by registered or certified mail. If such violation is not corrected to the satisfaction of the Mortgagee or Secretary ... within 30 days after the date such notice is mailed or within such further time as the Mortgagee or Secretary, as applicable, establishes in writing, without further notice the Mortgagee or Secretary, as applicable, may initiate any of the following actions.

. . . .

b. Collect all rents and other operating receipts of the Project, and use such collections to pay the Owner's obligations under this Agreement and under the Note and Mortgage and the necessary expenses of maintaining and operating the Project.

(Emphasis added). It is undisputed by either party that the Deed of Trust and the Regulatory Agreement must be read together. Because the language that is most disputed by both parties is in the Regulatory Agreement, the Court will hereinafter just refer to the Regulatory Agreement.[2]

## ANALYSIS

### I. FEDERAL OR STATE LAW

■ Before the Court determines which party is entitled to the rents, the Court must first determine whether federal or state law controls the assignment of rents provision in the Regulatory Agreement. The general rule in Bankruptcy is that state law determines a mortgagee's right to rents collected post-petition, "unless some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). One such federal interest is the determination of the "rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). When the United States through its agencies lends funds by the authority of federal legislation, the rights of the United States as a lender are derived from and warrant the protection of federal law. *Kimbell Foods*, 440 U.S. at 726–727, 99 S.Ct. at 1457.

■ The leading case involving HUD and its rights under an assignment of rents provision in a Regulatory Agreement is *United States v. Landmark Park & Associates*, 795 F.2d 683 (8th Cir.1986). In *Landmark Park*, the Eighth Circuit held that there was a need for a uniform federal rule to determine the means by which HUD may enforce an assignment of rents provision in its Regulatory Agreement. *Landmark Park*, 795 F.2d at 687. The court predicated its ruling on an "overriding federal interest in protecting the funds of the United States and securing federal investments." *Landmark Park*, 795 F.2d at 686, *quoting United States v. Victory Highway Village, Inc.*, 662 F.2d 488, 497 (8th Cir. 1981). Additionally, the Eighth Circuit noted the need to protect the "purpose and integrity of nationwide federal lending programs" such as HUD. *Landmark Park*, 795 F.2d at 686. Therefore, the Eighth Circuit held that federal rather than state law controls the manner in which HUD may perfect its interest under an assignment of rents provision in a Regulatory Agreement. *Landmark Park*, 795 F.2d at 683. *E.g., United States v. Floral Park Development Co.*, 619 F.Supp. 144, 147–148 (S.D.Ohio 1985); *United States v. American National Bank & Trust Co.*, 573 F.Supp. 1319 (N.D.Ill.1983); *In Re Executive House Associates*, 99 B.R. 266 (Bankr.E.D.Pa.1989); *cf. United States v. Buckley*, 73 B.R. 746 (D.S.D.1987) (adopted state law as the federal rule because the mortgage did not contain an assignment of rents provision). This Court agrees with the holding in *Landmark Park* and will

---

2. Debtor did not challenge the assignment of rents provision in the Deed of Trust. Instead, Debtor based its argument on the language in the Regulatory Agreement.

apply federal law to the assignment of rents provision.

## II. DID HUD PERFECT ITS INTEREST TO THE RENTS COLLECTED

██ The federal rule regarding perfecting an assignment of rents provision, as espoused in *Landmark Park*, is that the provision should be enforced according to its terms. *Landmark Park*, 795 F.2d at 687.[3] Other than recording the loan documents, HUD is required to take no affirmative act to perfect its interest in the rents unless the loan documents so require.[4] Courts which have interpreted an assignment of rents provision in Regulatory Agreements similar to the one at hand have held that HUD is entitled to the rents upon the default of the mortgagor. *Landmark Park*, 795 F.2d at 687; *Floral Park*, 619 F.Supp. at 148; *American National Bank & Trust*, 573 F.Supp. at 1323. Those courts held that the assignment of rents provision was activated immediately upon default. *Id.*[5]

██ The Debtor asserts that HUD was required to take some affirmative action before HUD could perfect its interest in the rents. The Debtor bases its argument on the fact that the Regulatory Agreement has language providing for 30 day written notice of a violation. However, when applying federal law to the assignment of rents provision in the Regulatory Agreement at hand, it is clear that HUD need not take any affirmative action to perfect its interest in the rents. According to the express terms of the Regulatory Agreement, the "Secretary [HUD] *may* send the Owner [Westwood] written notice...." REGULATORY AGREEMENT p. 14 (emphasis added). The verb "may" clearly indicates that written notice is not required to be given by HUD. Though the provision

provides that written notice may be given, it is not mandatory that HUD do so.

The Debtor asserts that this Court should interpret the Regulatory Agreement as the court in *In re Executive House* interpreted the one it had before it. In *Executive House*, the court recognized that an assignment of rents provision in a Regulatory Agreement must be interpreted under federal law. *Executive House*, 99 B.R. at 275. However, after the court analyzed the assignment of rents provision, the court held that HUD was required to take an affirmative act before its interest in the rents were perfected. *Executive House*, 99 B.R. at 276. The court held that the express terms of the Regulatory Agreement required HUD to give written notice of a violation and provide the debtor 30 days to cure before the debtor was declared to be in default. *Executive House*, 99 B.R. at 276. Written notice was required in *Executive House* even though paragraph 11 of the Regulatory Agreement stated that HUD "may give written notice"—just like the language in the Regulatory Agreement before this Court.

Paragraph 11 of the Regulatory Agreement in *Executive House* is very similar to that before this Court in that both provide that HUD "may give written notice". However, the Regulatory Agreement in *Executive House* contained a provision which the Regulatory Agreement before this Court does not. The Regulatory Agreement in *Executive House* provided in paragraph 12 that *"[u]ntil a default is declared* under this Agreement, ... permission is granted to Owners to collect and retain under provisions of this Agreement such rents, profits, income and charges, but upon default this permission is terminated as to all rents due or collected there-

---

**3.** The Court notes that if it were required to apply state law, the general rule in Texas is that an assignment of rents provision is not effective until the mortgagee undertakes some affirmative step to secure its rights in the rents collected between default and foreclosure. *Taylor v. Brennan*, 621 S.W.2d 592, 594 (Tex.1981).

**4.** At no time did Debtor assert that the loan documents were not properly recorded.

**5.** The Debtor's reliance on *Federal Deposit Insurance Corporation v. International Property Management, Inc.*, 929 F.2d 1033, as to the requirements needed to perfect an interest in rents is misplaced. The Fifth Circuit in *International Property Management* was interpreting Texas law and its disfavor towards absolute assignment of rents provisions.

after." *Executive House*, 99 B.R. at 276 (emphasis added). This part of paragraph 12 was very instrumental in the courts holding that HUD was required to take some affirmative act before it perfected its interest in the rents. To stress the court's reliance on this provision, the court reprinted this part of paragraph 12 with emphasis. No other provision was reprinted with emphasis by the court.

By its own terms, the Regulatory Agreement in *Executive House* clearly required HUD to take some affirmative act. Paragraph 12 expressly stated that the debtor in *Executive House* was entitled to use the rents "[u]ntil a default was declared" by HUD. Once HUD fulfilled its burden of first declaring that a default had occurred, its right to the rents was complete. This part of paragraph 12, when read in conjunction with paragraph 11, transformed the "may" language in paragraph 11 into a mandatory act. Any other reading of the Regulatory Agreement would have resulted in the two paragraphs being in conflict as to the requirements of HUD with respect to the rents.

As previously stated, the Regulatory Agreement before this Court contains no provision similar to that in paragraph 12. There is no language in the Regulatory Agreement which would clearly place an affirmative burden upon HUD to give notice of a default. Instead, the Regulatory Agreement is purely permissive in its requirement to give notice. Because there is no language in the Regulatory Agreement which would expressly require notice of default, as in *Executive House*, the Court holds that no affirmative act was required by HUD to perfect its interest in the rents.[6] HUD's interest was perfected the instant the Debtor violated the terms of the Regulatory Agreement. As such, the rents collected after the default are HUD's cash collateral.

## III. MAY THE DEBTOR USE HUD'S CASH COLLATERAL

As an alternative argument, the Debtor asserts that even if this Court held that all the rents collected after the default are HUD's cash collateral, the Debtor may still use the money to pay the approved fees and expenses because HUD has benefitted from the services provided.[7] The basis of this argument is that HUD is receiving more under the approved Plan of Reorganization ("Plan") than it would receive under liquidation in Chapter 7. Pursuant to the Plan, HUD has an allowed secured claim for $3,000,000.00 and an allowed unsecured claim for $3,100,000.00, with interest payable on both claims. HUD has a total allowed claim of $6,100,000.00 against property valued at $3,000,000.00. Because the original loan between the Debtor and HUD is non-recourse, if HUD were to foreclose its interest in the property, HUD would receive just the value of the property. HUD would not receive any money for its unsecured claim as it is in the Plan.

▆ The general rule in bankruptcy is that administrative expenses are charged against the estate and not against secured creditors.[8] *In re Delta Towers, LTD.*, 924 F.2d 74, 76 (5th Cir.1991); *In re EES Lambert Associates*, 62 B.R. 328, 338 (Bankr. N.D.Ill.1986). The debtor must look to unencumbered assets of the estate to pay administrative expenses. However, § 506(c) provides an exception to this general rule. To charge a secured creditor with the administrative expenses under § 506(c), there must be a showing that the fees and expenses were: (1) necessary, (2) reasonable, and (3) incurred primarily for the benefit of the secured creditor resulting in a quantifiable direct benefit to the

---

**6.** The Court finds that this holding is consistent with that in *Executive House.* If the Regulatory Agreement before this Court had contained similar language as that in paragraph 12, the Court would follow *Executive House* and require HUD to give notice to perfect its interest in the rents.

**7.** Debtor relies upon 11 U.S.C. § 506(c) which provides:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

**8.** Attorney fees and expenses are classified as administrative expenses. 11 U.S.C. 503(b)(2).

secured creditor. *In re Senior–G & A Operating Co., Inc.*, 957 F.2d 1290, 1298–99 (5th Cir.1992). Section 506(c) is to be interpreted narrowly with the burden of proving its elements on the Debtor. *In re P.C., LTD.*, 929 F.2d 203, 205 (5th Cir. 1991).

■■■■ Because the Court has previously found that the fees and expenses were reasonable and necessary, the Court must now determine whether the fees and expenses *directly* benefitted HUD rather than the Debtor or other creditors. *In re Flagstaff Foodservice Corporation*, 739 F.2d 73, 75 (2d Cir.1984); *accord Brookfield Production Credit Association v. Borron*, 738 F.2d 951, 952 (8th Cir.1984), *aff'g*, 36 B.R. 445 (E.D.Mo.1983); *In re KNM Roswell Limited Partnership*, 126 B.R. 548, 556–57 (Bankr.N.D.Ill.1991); *In re Tri–County Water Ass'n, Inc.*, 91 B.R. 547, 549 (Bankr.D.N.D.1988); *In re Birdsboro Casting Corp.*, 69 B.R. 955, 959 (Bankr.E.D.Pa.1987). The Court agrees with the Debtor that HUD has received some benefit from the Plan—no matter how much HUD may disagree. HUD is receiving a return on its allowed unsecured claim that it would not have received in liquidation. However, the benefit that HUD has received is only incidental. The services were incurred directly, and primarily, to assist the Debtor to reorganize and maintain ownership of the apartment complex. *EES Lambert Associates*, 62 B.R. at 342; *Flagstaff Foodservice Corporation*, 739 F.2d at 76. The Debtor did not hire its attorneys to fashion a Plan that was best for HUD. The Plan was fashioned to help the Debtor reorganize and still meet the requirements of the Bankruptcy Code. To allow the Debtor to use HUD's cash collateral to pay the Debtor's attorneys would in essence be having HUD pay its own attorneys along with the attorneys it was oppos-

ing.[9] This clearly would not be fair and equitable to HUD and would go beyond the equitable intent of § 506(c).

Further, even if HUD received some incidental direct benefit, the Debtor has failed to meet its burden of establishing which fees and expenses were incurred primarily for, and directly benefitted, HUD. The Debtor seeks to use HUD's cash collateral to pay *all* the approved fees and expenses. It is clear from an overview of the billing statements that many of the fees and expenses have nothing to do with HUD. Therefore, the Debtor failed to sustain its burden.

## IV. THE COURT DECLINES TO USE ITS EQUITABLE POWERS

■■■ As a final argument, the Debtor seeks to avoid the restrictions of the Regulatory Agreement by requesting this Court to use its equitable powers. The Debtor asserts that the Regulatory Agreement is not binding upon the Court and that the Court should look to the provisions of the Bankruptcy Code regarding the use of cash collateral to pay administrative expenses.

As has been noted by other courts that have addressed this very argument, debtors who are subject to Regulatory Agreements similar to the one before this Court are not without options. *In re Hil'Crest Apartments*, 50 B.R. 610, 612–13 (Bankr. N.D.Ill.1985); *In re Garden Manor Associates*, 70 B.R. 477, 482–84 (Bankr.N.D.Ca. 1987). By denying Debtor's use of HUD's cash collateral, the Court is in no way preventing the Debtor from paying its counsel nor precluding the Debtor from exercising its rights under the Bankruptcy Code. The Debtor is still free to pay with funds which are not HUD's cash collateral.[10]

**9.** Just because a creditor is getting more under a plan of reorganization than it would receive in liquidation does not establish that the creditor has received a direct benefit from the services. As part of receiving court approval of a plan, a debtor is required to establish that creditors are receiving as much as they would if the debtor were liquidated under Chapter 7. 11 U.S.C. § 1129. Therefore, to accept the Debtor's argu-

ment would mean that every debtor should be allowed to use encumbered assets to pay administrative expenses if the debtor was successful in getting its plan of reorganization approved.

**10.** Such funds could include monies which the Debtor is to pay to fund the Plan which to date have not been restricted to any particular use.

Further, the Court can not ignore the historical precedent of other courts in their protection of the aims and objectives of the National Housing Act when interpreting and enforcing Regulatory Agreements. *See, e.g., Landmark Park,* 795 F.2d at 685–86; *American National Bank & Trust Company,* 573 F.Supp. at 1322; *In re Tampa Bay Briarwood Associates Ltd.,* 118 B.R. 126, 128 n. 4 (Bankr.M.D.Fla. 1990); *cf. Kimbell Foods,* 440 U.S. at 726–29, 99 S.Ct. at 1457–59 (concerns the Small Business Administration and the Farmers Home Administration).

### CONCLUSION

Though the Court found the fees and expenses to be reasonable and necessary, the Debtor may not use HUD's cash collateral to pay them. HUD's interest in the rents were perfected the instant the Debtor defaulted on its loan documents. HUD had no affirmative duty to act to perfect its interest in the rents. Additionally, the Debtor has failed to meet its burden that it may use HUD's cash collateral pursuant to § 506(c). The approved fees and expenses were incurred primarily for the benefit of the Debtor and not HUD. Finally, the Debtor has failed to persuade the Court that the equities weigh on its behalf to engage this Court's equitable powers to override the restrictions of the Regulatory Agreement.

Accordingly, the Debtor is prohibited from using any monies which constitute HUD's cash collateral to pay the approved fees and expenses.[11] Orders reflecting the Court's ruling will be entered simultaneously with this memorandum opinion.

11. To the extent that the pre-petition retainer paid by the Debtor to its attorneys are from funds that are HUD's cash collateral, the attorneys are ordered to return the money to the estate.