In re MALL AT ONE ASSOCIATES, L.P., Debtor.

Bankruptcy No. 93–15504DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 3, 1995.

Lawrence J. Tabas, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for debtor.

Stewart Paley, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Bank of New York.

Douglas Candeub, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Mall at One Group, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Ivan J. Krouk, Lincoln Rittenhouse, Philadelphia, PA, for RK Mall Associates, Gen. Partner of the debtor.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before this court is a Motion filed by MALL AT ONE ASSOCIATES, L.P. ("the Debtor"), at filing the owner of a single realty asset, a shopping mall located at Roosevelt Boulevard and Grant Avenue in Philadelphia ("the Mall"). The Motion appears to be presently confined to a request for reimbursement of not only considerable counsel fees of the Debtor but also expenditures by the Debtor authorized under cash collateral stipulations ("the Stipulations"), pursuant to 11 U.S.C. § 506(c). The targets of the Motion are the Debtor's two secured creditors which were parties to the Stipulations: (1) Bank of New York—National Community Division ("BNY"), the oversecured first mortgagee of the Mall; and (2) Mall at One Group, L.P. ("Group") (collectively BNY and Group are referenced as "the Creditors"), the undersecured second mortgagee which sold the Mall to the Debtor on April 13, 1990, and repurchased it on April 11, 1995, at an auction sale conducted in accordance with the Debtor's Fifth Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Code ("the Plan"), which was confirmed on January 17, 1995.

Finding that the Third Circuit Court of Appeals ("the Appeals Court") has recently adopted a more restrictive approach to § 506(c) motions than it had in the past and that it continues to express a hostility to single realty asset debtors, we conclude that the Motion must be, for the most part, de-nied. The expenditures already made from the creditors' cash collateral cannot be effectively paid from the creditors' collateral for the second time. Only attorneys' fees (not paid from cash collateral) representing services devoted to leasing the Mall and conducting the auction sale contemplated by the Plan are found compensable, and from Group alone as the only creditor directly benefitted thereby. Therefore, we will allow the Motion in the amount of only $10,840.50, payable by Group only.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the voluntary Chapter 11 bankruptcy case from which the Motion arises on September 20, 1993. The Debtor had four substantial pre-petition secured creditors: (1) BNY, fully secured in its claim in the amount of approximately $4.3 million, in light of the estimated value of the Mall of $7 million, which was in fact received for it at the auction sale; (2) Group, whose asserted secured claim of approximately $5.5 million was obviously undersecured; (3) ING Vastgoed One B.V. ("Vastgoed"), a Netherlands corporation with a third mortgagee on the Mall in excess of $3.8 million, which gracefully agreed to receive nothing under the Plan; and (4) the City of Philadelphia ("the City"), which asserts secured and priority claims for pre-petition real estate taxes of approximately $250,000 and administrative claims for post-petition real estate and business use and occupancy taxes totalling over $300,000. Objections by Group to the City's claim, joined by the Debtor, were the subject of a full-day trial, the post-trial briefing addressing which is to be completed by August 11, 1995.

After filing a series of unconfirmed plans, the earliest versions of which featured subsequently-withdrawn funding proposals by Vastgoed, the Debtor filed the ultimately-confirmed Plan on December 2, 1994. The Plan, supported by Group but opposed by BNY (which appealed from the confirmation Order), provided for a sale of the Mall to a private party, New Plan Realty Trust ("New Plan"), for a price of not less than $7 million and further provided that, in the event that

this sale did not occur, the Mall was to go to auction.

The sale to New Plan unfortunately fell through and much contentiousness among the interested parties followed. The Debtor attempted to forestall the auction sale with a motion to modify the Plan to permit a private sale of the Mall to Delancey Investment Group, Inc. ("Delancey") for $7,125,000. The Creditors opposed this Motion and it was denied. Group credit bid $7 million at the auction of April 11, 1995, and Delancey, allegedly faced with less favorable sale conditions than in the private sale transaction proposed earlier to the Debtor, made a cash bid of only $6 million at the auction. Delancey's efforts to invalidate the sale to Group, joined by the Debtor, were rebuffed in a decision reported at 1995 WL 318851, 1995 Bankr. LEXIS 716 (Bankr.E.D.Pa. May 23, 1995). Despite an Order accompanying that decision directing the Debtor to transfer the Mall to Group, the Debtor's partners have resisted this transfer. BNY allowed Group to assume its mortgage and has generally supported its efforts to consummate the sale to it. However, BNY is unhappy because mortgage payments to it, which were made through the auction sale date, have now ceased pending settlement..

The rancor among the parties was the gestation for the Motion of Debtor for Allowance of Claim Pursuant to Section 506(c) of the Code and for an Order Directing Payment of Claim from Secured Parties' Collateral at Closing on Property and/or in the Alternative for a Redistribution of Administrative Expenses Previously Paid, or Declare Plan to be in Default and Awarding the Debtor Damages for the Breach Thereof, which, as amended on June 16, 1995, is the Motion before us. The alternative relief sought in the Motion—namely a declaration that the City's claims be paid immediately or a default by Group in the Plan auction sale requirements be declared—appears to have been abandoned. However, it must be noted that the Motion is at least partially a tactical opposition piece to the positions of Group and BNY in the case, and its demands, totalling $1,770,027.13 for expenses and $89,425.50 for counsel fees, are rather obviously inflated beyond the normal scope of recoveries

sought in a § 506(c) motion. The Motion seeks attorney's fees in connection with preparation of all versions of the Plan ($47,-450.75); negotiation of both cash collateral stipulations ($10,463.75); promulgation of new leases and renewals of existing leases at the Mall ($3,535.00); negotiation of tax issues ($4,311.50); services performed in connection with the appeal by BNY of the Plan and in defending BNY's motions for relief and to convert this case to Chapter 7 ($6,887.00); and actions taken in connection with the auction ($7,387.00). "Expenses" requested include all payments made by BNY during the case(!) ($924,768.10); the auctioneer's commissions and expenses ($55,000); various maintenance expenses for the Mall (totalling $47,269.45); fit-out expenses for two tenants ($61,480.00); utility expenses to PECO ($48,-829.00); insurance costs ($28,700.78); water bills ($76,829.01); liability for unpaid taxes to the City ($223,640.49); and the tax escrow paid to BNY, as yet untapped for tax payments ($294,200.00).

It is important to note that there were apparently two cash collateral Stipulations in effect during the course of this case. The first is reflected only by a docket entry indicating that a motion of the Debtor to use the cash collateral of the Creditors, filed on April 20, 1994, was settled on June 1, 1994. The written, Second Stipulation, approved by Order of November 23, 1994, covered the time period from September 1, 1994, to January 31, 1995, or the date of entry of a conversion or confirmation Order, whichever occurred first. The Stipulation included a budget attached as an exhibit, and provided that, if the Debtor wished to utilize cash collateral outside of the budget, which included payments to BNY, tax escrows, utility payments, and various maintenance costs, it was required to first obtain the written consent of the Creditors. At the foot of the budget are several "Notes," including the following:

(1) This budget assumes collection of monies from tenants.

(2) There are no allowances for tenant improvements or capital improvements (except Rib It).

(3) It is assumed that no new leases commence and all leases in place remain . . . .

(6) Legal services will be set forth as determined by the court but are not included above....

(9) This budget does not include $30,000 of landwork for Rib–It for which a rent credit of $5,000 per month for 6 months will be given to Rib It....

Despite the parties' apparent belief that the Second Stipulation extended to February 28, 1995, the confirmation of Plan on January 17, 1995, apparently terminated it as of that date.

We conducted a hearing on the Motion, lasting over four hours on June 26, 1995. The parties were invited to submit post-trial briefs, and such were duly received on July 11, 1995. Group, apparently aware of our disdain for submission of unsolicited reply briefs, *see In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333 (E.D.Pa.1988), filed, on July 13, 1995, an application for permission to file an attached one-paged statement complaining that the Debtor, in its brief, had strayed outside of the record. While the Debtor opposed the application, we will grant same and consider the substance of the Debtor's Objection to the application as a permissible sur-reply.

During the trial, the Debtor introduced a plethora of documents into evidence to illustrate the post-petition expenditures and expenses incurred. Neal Rodin, the majority stockholder of the Debtor's corporate general partner, testified concerning the negotiation of new leases and efforts to keep existing tenants, all of which occurred post-petition. He testified that several more tenants wanted to leave but that negotiations with the Debtor convinced them to remain. Further, one tenant, operating an Annie Sez store in the Mall, took on some additional space.

Although the Debtor introduced into evidence the original leases, the addenda or proofs of renewals of leases were not submitted at trial. There was merely testimony from Rodin that these leases were renewed, indicating that the renewals occurred around the time the original leases were to expire, and that the tenants are still occupying the stores and paying rents. However, the Annie Sez lease was not due to expire until 1997. While it is true that the Annie Sez store took on more space, there was no evidence presented to substantiate the allegations that its owners wished to leave, even though their lease was not to expire until 1997, or that they only stayed after being persuaded by the Debtor to do so.

Further, Rodin testified that the Debtor brought in three new tenants during the Chapter 11 case: (1) Pamela Lomberg t/a Nails for You Inc., on October 28, 1993, for seven years; (2) David and Renee D'Angelo t/a The Chiropractic Center for Life Improvement, P.C., on October 8, 1993 for five years; and (3) S.J. Rib–It Inc., on July 14, 1994. He also testified that a large pylon sign, which had been damaged in a storm over a year before and was a key to attracting traffic on Roosevelt Boulevard, was in the process of being repaired.

The Debtor next called Martin Sigel, qualified as an expert appraiser, to allegedly quantify the economic effect of these new and renewed leases. Sigel offered a one-page Estimate of Value in which he determined the effect of the leases on the value of the Mall, contending that, since the new tenants were quality tenants, he believed that the leases resulted in a $1,300,000 increase in value. Sigel did concede that he had no opinion as to the overall value of the Mall. He nevertheless opined that the market value of the Mall would have decreased had the new tenants not been acquired. He also conceded that, if he were to do the same valuation taking Annie Sez out of the picture (as Annie Sez was a renewal with a fit-out, not a new tenant), the $1,300,000 figure would have been significantly lower. Sigel also affirmed the significance of repairing the pylon sign. We have no reason to dispute Sigel's expertise or the accuracy of his testimony on its own terms, since neither Group nor BNY presented any evidence to contradict his Estimate of Value.

David C. Shuter, Esquire, an associate in the law firm of Obermayer, Rebmann, Maxwell & Hippel ("the Obermayer Firm"), the Debtor's appointed counsel, was permitted to introduce, in lieu of testimony but subject to

cross-examination, copies of the Obermayer Firm's one interim and its final applications for compensation, annotated to reflect entries for which reimbursement from the Creditors was sought under § 506(c). The interim fee application, seeking compensation for services and expenses of $61,688 and $4,642.40, respectively, had been granted in the reduced amounts of $54,504.00 and $2,991.896, respectively, on November 23, 1994. The final application, filed June 6, 1995, requested a total of $80,524.50 for services and $8,662.41 for expenses, was allowed in the reduced amounts of $75,039.10 and $8,124.41, respectively, after a hearing on Objections thereto by BNY and Group on August 2, 1995. The August 2, 1995, Order also limited the Debtor to collection of $90,000 in addition to its retainer of $24,000, in accordance with a Plan provision restricting the Obermayer Firm to collection of that amount on account of its total fees in this case.

On cross-examination Shuter stated that he had annotated all entries on the Applications relating to preparation of the Plan and all of its predecessors as compensable services under § 506(c). This procedure was justified by Shuter by his statement that the plans were all prepared with an "eye toward disposal of the property," and his contention that such a disposal would necessarily benefit the Creditors. Shuter described a similar broad-brushed approach with respect to entries that dealt with cash collateral and preparation of the Stipulations. He testified that all entries related to these matters were noted as compensable because all expenditures noted therein were made to keep up and improve the Mall, and hence would benefit the Creditors. The same broad approach was described with respect to the other categories of services for which the Obermayer Firm requested compensation, as indicated at page 985 *supra*, per his annotations.

## C. DISCUSSION

### 1. THE APPEALS COURT HAS RECENTLY PROMULGATED A MORE STRINGENT TEST FOR ALLOWANCE OF § 506(c) APPLICATIONS.

■ In its most recent pronouncements on the subject of allowance of motions under 11 U.S.C. § 506(c), the Appeals Court has, initially, restated the well-recognized general rule that administrative expenses occurring post-petition are not permitted to be charged against secured collateral. *In re Visual Industries, Inc.*, 57 F.3d 321, 324 (3d Cir.1995). The sole statutory exception to that general rule is depicted in 11 U.S.C. § 506(c), which reads as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

It has been established by the Appeals Court, since its decision in *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3d Cir. 1986), that individual creditors, as well as a debtor-in-possession, have standing to bring a § 506(c) claim as if they were in the shoes of the trustee. *Accord, Visual Industries, supra*, 57 F.3d at 325. *See In re Nutri/System, Inc.*, 169 B.R. 854, 872 n. 10 (Bankr. E.D.Pa.1994) *("Nutri/System I"), aff'd*, 178 B.R. 645 (E.D.Pa.1995) *("Nutri/System II")*; and *In re Cann & Saul Steel Co.*, 86 B.R. 413, 415–16 (Bankr.E.D.Pa.1988).

This court has devised two general alternative tests for determining when claims for reimbursement under § 506(c) are recoverable, an objective and a subjective test, and these general tests have been adopted by the District Court. *See Nutri/System II, supra*, 178 B.R. at 659, *adopting Nutri/System I*, 169 B.R. at 872; *In re Orfa Corp. of Philadelphia*, 149 B.R. 790, 798–99 (Bankr.E.D.Pa. 1993) *("Orfa I"), vacated on other grounds but followed on this issue*, 170 B.R. 257, 271–73 (E.D.Pa.1994) *("Orfa II")*; and *Cann & Saul, supra*, 86 B.R. at 418.

In articulating the criteria for applying the objective test, we have set forth three requirements, as expressed in the past by the District court and other judges of this court, which must be met to recover costs pursuant to § 506(c): (1) the expenditures or services were necessary; (2) the amount of the expenditures or services was reasonable; and (3) the expenditures conferred a direct benefit upon the secured creditor. *See Nutri/Sys-*

*tem II, supra,* 178 B.R. at 658, *adopting Nutri/System I, supra,* 169 B.R. at 872; *Orfa II, supra,* 170 B.R. at 272; *In re Mechanical Maintenance, Inc.,* 128 B.R. 382, 389 (E.D.Pa.1991); and *In re Trenge,* 127 B.R. 552 (E.D.Pa.1991). *See also In re Birdsboro Casting Corp.,* 69 B.R. 955, 959 (Bankr. E.D.Pa.1987) (FOX, J.); and *In re Glickman, Berkowitz, Lavinson & Weiner,* Bankr. No., 94–17034SR, slip op. at 6 (Bankr.E.D.Pa. May 12, 1995) (RASLAVICH, J.).

■ The subjective test, on the other hand, considers whether the secured creditor expressly requested or consented to the expenditures. *See Nutri/System II, supra,* 178 B.R. at 659, *adopting Nutri/System I, supra,* 169 B.R. at 872. If the secured creditor has requested or consented to the services or expenditures, then the claimant will be entitled to recovery, at least to the extent of any request or express consent to same. *Id. See also Orfa I, supra,* 149 B.R. at 799. The consent, however, must be clear and unequivocal as to the specific charge or expense at issue. *Nutri/System II, supra,* 178 B.R. at 659, *adopting Nutri/System I, supra,* 169 B.R. at 872; and *Orfa I, supra,* 149 B.R. at 799 ("Only the relatively small category of services to which the secured party gave its 'imprimatur' were deemed to fall into the category of acts to which the secured creditor consented."). *See also In re Iberica Mfg., Inc.,* 180 B.R. 707, 713 (Bankr.D.P.R. 1995); and *In re Phoenix Pipe & Tube, L.P.,* 1993 WL 303997, slip op. at *1 n. 1 (Bankr. E.D.Pa. May 26, 1993), *aff'd,* 174 B.R. 688 (E.D.Pa.1994) ("*Phoenix II*").

While we believe that the three-part objective test criteria noted above was a fair statement of the law as articulated in *McKeesport Steel, supra,* 799 F.2d at 94, which included what appeared to be an express rejection of the narrow formulation of the § 506(c) criteria in *In re Flagstaff Foodservice Corp.,* 762 F.2d 10, 12 (2d Cir.1985), we must observe that the Appeals Court, in *Visual Industries, supra,* 57 F.3d at 325; and *In re C.S. Associates,* 29 F.3d 903, 906 (3d Cir.1994), appears to have decided to accept the *Flagstaff* approach after all. Quoting from *C.S. Associates,* at *id.,* the Appeals Court, in *Visual Industries, supra,* 57 F.3d at 325–26, states:

Our decisions have clarified that to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors. *Equibank [, N.A. v. Wheeling–Pittsburgh Steel Corp.],* 884 F.2d [80,] at 84, 86–87 [ (3d Cir.1989) ]; *In re McKeesport Steel Castings Co.,* 799 F.2d 91, 94–95 (3d Cir.1986), *see also In re Glasply Marine Indus.,* 971 F.2d 391, 394 (9th Cir.1992) ("[T]o satisfy the benefits prong [of § 506(c) the claimant] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." (internal quotation marks omitted)); *In re Flagstaff Foodservice Corp.,* 762 F.2d 10, 12 (2d Cir.1985) ("[T]o warrant [§] 506(c) recovery . . . [the claimant] must show that . . . funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure.").

*See Phoenix II, supra,* 174 B.R. at 691, in which this new, two-part criteria is applied.

In our view, the foregoing analysis of the direct benefit to the creditor test, including the quotation, with approval, of the language in *Flagstaff* which references a requirement that the expenditure must be directed primarily to the benefit of the creditor, are significant. While application of the objective test has always been accompanied by the disclaimer that indirect, incidental, or secondary benefits to creditor, would not suffice, *Phoenix II, supra,* 174 B.R. at 691; *In re Westwood Plaza Apartments, Ltd.,* 154 B.R. 916 (Bankr.E.D.Tex.1993); and *In re Baum's Bologna, Inc.,* 50 B.R. 689, 690 (Bankr. E.D.Pa.1985), it seems clear, under the *Visual Industries* and *C.S. Associates* standards, that the need for an undertaking to be primarily for the creditor's benefit heightens the barrier to be scaled to invoke § 506(c). The *Flagstaff* language requires that a primary direction of a benefit be to the creditor, and this may even require a § 506(c) movant to establish that assistance to the creditor was the primary motivation of the movant's actions.

2. *THE DEBTOR CANNOT SATISFY THE SUBJECTIVE TEST AND CAN SATISFY THE OBJECTIVE TEST AS TO ONLY A SMALL PORTION OF THE ATTORNEY'S FEES RE-QUESTED BY THE OBERMAYER FIRM, AS TO GROUP ONLY.*

a. *The Subjective Test Is Not Met as to Either Creditor.*

■ Initially, we conclude that the Debtor cannot satisfy the subjective test with respect to any of the sums requested from either of the Creditors. Clearly, the instant facts are nowhere close to those of *Orfa I, supra,* 149 B.R. at 792, 799, where the trustee invoking § 506(c) was appointed by reason of a motion joined by the creditor. Nor has it even established that the Debtor proposed the Plan in a mode of full cooperation with either of the Creditors, as in *Cann & Saul, supra,* 86 B.R. at 414.

BNY clearly opposed the Plan. It is not to be taken to task or saddled with counsel fees merely because, as the Debtor states in its brief, it cooperated with the Debtor off the record at some level in its endeavors. Group may have approved certain aspects of the Plan, voted for it, and has or will become the owner of the Mall because of it. However, the Debtor and Group have been in constant dispute about specifics of the Plan, whether it should have been modified to permit the sale to Delancey, and how and when the sale to Group should be consummated. Therefore, many issues regarding the proper interpretation of the Plan, in light of the events which have unfolded, have emerged. It now appears that whatever meeting of the minds the Debtor and Group had regarding the form and substance of the auction sale process and its aftermath, which is the centerpiece of the Plan, was illusory.

Therefore, as in *Nutri/System II,* 178 B.R. at 659, *adopting Nutri/System I,* 169 B.R. at 874–75, we find that the small measure of concerted effort between the Debtor and Group was too tenuous to support a contention that the Debtor proposed its Plan or took any actions solely or primarily at the request of Group, for purposes of § 506(c). Again, clearly, this test is not met as to BNY.

We therefore reject any § 506(c) claims of the Debtor under the subjective test.

b. *BNY Is Not Chargeable with Any Reimbursement to The Debtor Under § 506(c).*

■ With respect to the application of the new, two-part objective test articulated in *Visual Industries* and *C.S. Associates* to BNY, we again can summarily dispose of all of the Debtor's § 506(c) claims. BNY was at all times a substantially oversecured creditor. It is clear that many buyers existed who would have purchased the Mall for a sum substantially in excess of BNY's total secured claim. Therefore, every action which the Debtor took in this case short of allowing BNY to foreclose as soon as possible provided a clear detriment, rather than any direct benefit, to BNY. Stated otherwise, the courses of action taken by the Debtor to relet and conduct the auction sale of the Mall, which we find at pages 991–992 *infra,* are chargeable to Group, did not benefit BNY in the least. These actions merely delayed BNY's realization of the payoff of its mortgage.

Furthermore, in *In re Union Meeting Partners,* 178 B.R. 664, 681–82 (Bankr. E.D.Pa.1995), we observed that the recent decisions of the Appeals Court have rendered it almost impossible for a debtor owning a single realty asset to cram down a plan which is opposed by its primary secured lender. This trend of decisions has continued unabated, observing the Appeals Court's recent decision making use of assigned rents very problematic for realty asset debtors in *In re Jason Realty, L.P.,* 59 F.3d 423 (3d Cir. 1995); and the Appeals Court's summary affirmance of the denial of confirmation of one of the *Union Meeting* debtor's plans, Nos. 94–1790 and 94–1791 (3d Cir. March 31, 1995), *aff'g,* 165 B.R. 553 (Bankr.E.D.Pa.), *aff'd,* C.A. No. 94–2419 (E.D.Pa. July 29, 1994). These decisions suggest that whatever a single-asset realty debtor undertakes in the course of its bankruptcy is done at its own peril, and with little thought of bestowing benefits to anybody other than the debtor's partners, who are clinging desperately to the property. In this context, it is difficult for a debtor's counsel to argue that its ac-

tions were engaged in primarily for the benefit of its secured creditors. Neither *Nutri/System, Orfa,* nor *Cann & Saul,* where § 506(c) claims were carefully considered, involved single asset realty debtors, but rather each involved businesses whose reorganizations were poised to serve the classic bankruptcy purpose of preserving jobs and aiding the economy. *Compare In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 422–23 (Bankr. E.D.Pa.1994).

c. *The Debtor's Expense Claims Cannot Be Recovered from Either Creditor.*

■ We can also rather easily dispose of all of the claims made by the Debtor under § 506(c) which relate to expenses of the Debtor, as opposed to attorney's fees for services performed by the Obermayer Firm. As the cash collateral Stipulations manifest, the expenses in issue were expressly permitted to be paid from the cash collateral of the Creditors in the Debtor's rents. In essence, the Creditors advanced their own collateral to the Debtor one time to allow the Debtor to remain in business. The Creditors cannot be called on to make these same advances from their security interests in the rents a second time. There is no evidence that the Creditors gave their written consent to any modifications to the Stipulations, as was required by the Stipulations with respect to any use of their cash collateral not expressly authorized thereby. The expenses requested were therefore already paid out of the Creditors' cash collateral in rents, either consensually or non-consensually. If done consensually, the depletion to the Creditors' cash collateral has already been effected. If non-consensually, the expenditures were illegal and should not be charged to the Creditors for that reason.

We also note, in this context, that the Creditors' security interest in the Debtor's rents has been greatly strengthened by the Appeals Court's decision in *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34, 37–39 (3d Cir.1993). *Accord, Jason Realty, supra.* Cf. *Union Meeting, supra,* 178 B.R. at 672–78. In light of these decisions, it is very difficult to argue that the Debtor had an interest in rents free and clear of the Creditors' security interests.

■ Furthermore, we observe that the largest of the expenses claimed are the most inappropriate. The Debtor cites no authority for its efforts to recoup the mortgage and escrow payments to BNY under § 506(c). These payments were made in compliance with contractual obligations, not as benefits bestowed upon BNY by the Debtor. Had they ceased, BNY would almost certainly have succeeded in preventing confirmation of the Plan through its objections, and would have probably either forced the Debtor to obtain confirmation promptly, or obtained relief from the stay and terminated the Debtor's efforts at a far earlier juncture than the ultimate Plan confirmation date. Finally, the claim for "repayment" of real estate taxes lacks merit, because, as numerous motions and the trial of the Objections to the City's claim on July 19, 1995, have made clear, the taxes have never been paid by the Debtor. However, irrespective of these transparent difficulties with certain of the expense claims of the Debtor, the presence of the cash collateral Stipulations renders each and all of them uncollectible under § 506(c).

d. *Only a Small Portion of the Attorney's Fees Sought by the Obermayer Firm Can Be Asserted Against Group Under § 506(c).*

■ Whether the fees requested by the Obermayer Firm are collectible from Group under the application of the objective test criteria is the only issue raised by the Motion which remains. These fees, if payable to the Obermayer Firm, would be payable in their capacity as an administrative creditor of the Debtor. They are therefore not expenses of the Debtor subject to the Stipulations. Consequently, they are potentially payable under the two-part criteria established in *Visual Industries* and *C.S. Associates, supra.* We will analyze each of the categories of services which are allegedly covered by § 506(c) per the Motion in turn.

■ Beginning with the services in furtherance of preparation and presentation of all of the Debtor's several plans of reorganization, we initially observe that attorney's fees incurred primarily to assist the Debtor

in the reorganization process are not generally chargeable against secured collateral. *See In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 75–76 (2d Cir.1984); *In re RLA of Madison, Inc.,* 177 B.R. 78, 81 (Bankr. M.D.Tenn.1994); and *Baum's Bologna, supra,* 50 B.R. at 690. We agree with the conclusion of the court in *RLA, supra,* 177 B.R. at 81, particularly in light of the Appeals Court's recent narrow reading of the scope of charges subject to reimbursement by creditors pursuant to § 506(c), that services incurred primarily to assist a debtor in the bankruptcy process and to help the debtor formulate a successful plan of reorganization only yield an incidental benefit to the secured creditors.

By way of contrast, attorney's fees charged in connection with the plan process *were* found to be potentially recoverable in *Cann & Saul, supra,* 86 B.R. at 413, where there was evidence that the plan had been changed in a specific way at the request of or by the urging of the secured creditor. *Compare Westwood Plaza, supra,* 154 B.R. at 922 (no recovery of attorney's fees was permitted for plan preparation because the debtor did not hire the attorneys to fashion a plan best for HUD, but, rather, to assist the debtor on reorganization and to meet Code requirements; hence, the benefits to HUD were indirect and incidental).

Shuter, as noted above, testified that the plans were formulated with an eye toward disposal of the Mall, and this benefitted the Creditors. While this may be true, we find that the Debtor's principal reason for employing the Obermayer Firm was to assist the Debtor in the reorganization process. There has been no evidence that the plans were specifically altered or modified at the request of a secured creditor. The Debtor has not even claimed an effort to benefit Group in the formulation of its prior plans. The blanket request for all fees is therefore not well taken, as it is inconceivable to us how the preceding unconfirmed plans benefitted anyone involved. The request for attorney's fees in connection with preparation of all of the various versions of the plans is hence clearly misplaced. The fact that Group supported and voted for the Plan is not sufficient to establish that even the Plan

provided a direct benefit to Group. We hold that, even as to the confirmed Plan, the Debtor has not satisfied the demanding objective test as to Group.

The Debtor also seeks fees in reference to the proposed sale of the Mall to New Plan. However, it must be recalled that the proposed sale to New Plan never materialized, triggering the auction process. Section 506(c) does not provide for recovery of hypothetical benefits, or benefits that may have been conferred if a certain event had occurred. In that sense, the wisdom of hindsight may properly be utilized, and may be sufficient, to eliminate a particular aspect of a § 506(c) claim. Group did not receive any benefit from the proposed sale to New Plan. Without such a direct benefit having been conferred to the Group, the Debtor is unable to satisfy the objective test as to such services.

The Debtor is, next, seeking to recover attorney's fees in connection with the cash collateral Stipulations. However, again, the Debtor did not prove that the Stipulations benefitted the Creditors. The Stipulations allowed the Debtor to remain a viable debtor-in-possession and to continue its business of operating the Mall. That is the only resultant direct benefit of the Stipulations. The Appeals Court decisions regarding single realty asset cases make it clear that the needs of such debtors for the use of rents are not a controlling factor, and that allowing debtors to survive will not be a significant factor in decisions regarding use of cash collateral. The Debtor was therefore not negotiating this issue from a position of strength. While it is true that the Creditors may have received a secondary benefit by the way in which the cash collateral was expended, nonetheless the direct beneficiary of the Stipulations was the Debtor, which needed the use of rents to survive. Thus, the objective test was not satisfied as to Group for such services.

Finally, with respect to the Debtor's claims arising from promulgation of new leases and renewal of old leases at the Mall, we find that limited relief to the Debtor as to Group is appropriate. The expenses in-

curred in negotiating new leases to occupy vacant space in a property have been held elsewhere to directly benefit the secured creditor of a debtor-landlord. *See In re North County Place, Ltd.,* 92 B.R. 437 (Bankr.C.D.Cal.1988) (the leasing of the property directly preserved and protected the property, thus providing a direct benefit to the secured creditor). These leases preserved the property, and there was unrebutted expert testimony from Sigel indicating that the Mall enjoyed a significant increase in value due to the promulgation of new leases and renewal of other leases. While the actual amount of the increase in value is in dispute, and is probably not established by Sigel's testimony, it is clear to us that the Mall and thus an undersecured creditor such as Group benefitted from the negotiations and execution of new leases in an amount in excess of the modest value of reimbursement sought for services for this purpose. We also find that the limited services performed in assuming the Debtor's other leases meet the § 506(c) objective test criteria as to Group.

■ Having satisfied the difficult, second objective test criterion of showing a direct benefit to Group from the Obermayer Firm's lease-related services, we must now further consider whether these expenses were reasonable and necessary. We believe that the expenses were necessary, as, without them, certain portions of the Mall would be vacant and the Mall, as a whole, would have a lower value. The time expenditures do not appear to be unreasonable. Our independent review of the fee application entries attributable for services, attached hereto as Appendix "A," results in a slightly *higher* figure for such fees ($3,546.50) than the $3,535.00 requested. Fees in the requested amount of $3,535.00 are therefore modest, reasonable, and allowable.

■ Next, the Obermayer Firm is seeking attorney's fees in connection with the auction and eventual sale of the Mall to Group. Auction costs have been recognized as a classic example of expenses generally recoverable pursuant to § 506(c), even in *Visual Industries, supra,* 57 F.3d at 325, citing 3 COLLIER ON BANKRUPTCY, ¶ 506.06 (15th ed. 1994). The sale of the Mall at auction to Group did benefit Group, as the successful purchaser, in a unique and therefore direct way. Again, our careful review of the entries on the fee applications for such services reveals that they were generally reasonable and necessary to effectuate the auction. Upon concluding our independent review of the fee applications, the pertinent portions of which are attached hereto as Appendix "B," we find that compensation for such services should be granted in the amount slightly reduced from the requested sum of $7,387.00 to $7,305.50. Reimbursement in the latter amount will therefore be allowed.

■ The Debtor is also requesting fees for services incurred in opposing BNY's appeal of the Order confirming the Plan on January 17, 1995. However, Shuter admitted that the Debtor did not even submit a brief in opposition to the appeal, but rather merely joined with a brief submitted by Group. Despite the fact that the Debtor obviously supported the position of Group on the appeal, Group apparently did the necessary work on the appeal without the Debtor's assistance. There is no evidence of any direct benefit conferred upon Group as a result of the Debtor's actions, which were apparently mostly duplicative of those of Group. Recovery of attorney's fees for these services is therefore not permissible under § 506(c).

■ The Debtor also requested legal fees in connection with its opposition to BNY's motions for relief and to convert this case to a Chapter 7 case. In his testimony, however, Shuter testified that it would require speculation on his part to try to ascertain the impact or effect that there would have been upon Group's position had BNY prevailed on either of these motions. The docket does not reflect whether Group itself actually opposed this relief. We believe that the Debtor was obliged to quantify, at least to some degree, the benefit conferred upon Group by its services in order to obtain compensation for those services under § 506(c). Since it did not do so on this record, it is not entitled to recovery of compensation for those services from Group.

■ Finally, the Obermayer Firm requests reimbursement for its fees related to certain tax issues, including participation in the hearing objecting to the City's claims on July 19, 1995. However, the determination of benefit to the estate from these services is impossible, since briefs addressing the objection are not yet due and the matter is therefore still under advisement. This court is not prepared to prematurely speculate on the chances that Group may receive a benefit in the future from any legal services on this issue. Furthermore, as in the case of the services performed in defending the confirmation Order upon BNY's appeal, Group has borne the laboring oar on this issue by filing and prosecuting the objections itself. The Debtor has not established how the Obermayer Firm's services benefitted Group over and above Group's own actions on this issue.

Therefore, we conclude that the Debtor, per the Obermayer Firm, is entitled to recover only $3,535.00 for its services on the lease renewal issues and $7,305.50 on the auction sale issue from Group under § 506(c) pursuant to the Motion, or a total of $10,840.50.

## D. CONCLUSION

An Order consistent with the conclusions articulated herein will be entered.

# APPENDIX A

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31,1994
A CHAPTER 11

MALL AT ONE ASSOCIATES, L.P.
222 WEST RITTENHOUSE SQUARE
PHILADELPHIA, PA. 19103

| Date | Services | Atty | Hours | Value |
|------|----------|------|-------|-------|
| 8/20/93 | MEETING WITH IVAN KROUK TO PLAN CHAPTER 11 PROCEEDING. | LJT | 2.6 | 741.00 |
| 8/20/93 | PREPARE CHAPTER 11 PLEADINGS. | LJT | 1.1 | 313.50 |
| 8/20/93 | CONFERENCE WITH IVAN KROUK RE: THIRD MORTGAGE. | LJT | .2 | 57.00 |
| 8/20/93 | REVIEW LOAN DOCUMENTS AND PREPARE SCHEDULE FOR FILING. | LJT | 1.8 | 513.00 |
| 8/23/93 | REVIEW AND SUMMARIZE FILING. | LJT | .2 | 57.00 |
| 8/25/93 | CALL TO ROBERT SHAPIRO COUNSEL TO FIRST MORTGAGEE. | LJT | .2 | 57.00 |
| 8/25/93 | MEETING WITH NEAL RODIN TO DISCUSS REORGANIZATION. | LJT | .8 | 228.00 |
| 8/25/93 | TELEPHONE CALL FROM LENNY GOLDBERGER RE: SUPER-PRIORITY LOAN. | LJT | .2 | 57.00 |
| 8/27/93 | REVIEW DOCUMENTS AND OTHER MATERIALS SENT BY THE CLIENT IN CONNECTION WITH THE MORTGAGES AND LEASES AGAINST THE PROPERTY. | LJT | 1.2 | 342.00 |
| 8/27/93 | CONVERSATION WITH LENNY GOLDBERGER REGARDING POSSIBLE SUPER PRIORITY FINANCING. | LJT | .3 | 85.50 |
| 8/27/93 | REVIEW ADDITIONAL MATERIALS IN CONNECTION WITH PREPARATION OF SCHEDULES. | LJT | .6 | 171.00 |
| 9/09/93 | REVIEW THE MATERIALS IN CONNECTION WITH THE PREPARATION OF SCHEDULES. | LJT | .8 | 228.00 |
| 9/16/93 | PREPARE MOTION TO EXTEND TIME TO FILE SCHEDULES. | LJT | .2 | 57.00 |
| 9/20/93 | TELEPHONE CALL TO K. CAREY REF NEW LEASE. | LJT | .3 | 28.50 |
| 9/20/93 | TELEPHONE CALL TO K. CAREY RE: NEW TENANT. | LJT | .2 | 57.00 |
| 9/20/93 | TELEPHONE CALL TO IVAN KROUK RE: PLAN AND SCHEDULES. | LJT | .2 | 57.00 |
| 9/22/93 | MEET WITH IVAN KROUK TO PREPARE A PLAN AND TO REVIEW TENANT ISSUES. | LJT | 1.2 | 342.00 |
| 10/05/93 | TRAVEL TO AND FROM MEETING WITH MORTGAGEES. | LJT | 2.8 | 798.00 |

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31, 1994
A CHAPTER 11

| Date | Services | Atty | Hours | Value |
|------|----------|------|-------|-------|
| 10/05/93 | MEET WITH IVAN KROUK AND DISCUSS PLANS OF REORGANIZATION (2.5) AND PREPARE FOR MEETING (.5). | LJT | 3.0 | 855.00 |
| 10/05/93 | MEET WITH MORTGAGEE AND THEIR COUNSEL TO DISCUSS A PLAN IN HACKENSACK. | LJT | 2.8 | 798.00 |
| 10/07/93 | REVIEW INFORMATION FOR BANK STIPULATION. | LJT | .4 | 114.00 |
| 10/12/93 | REVIEW AND DRAFT CASH COLLATERAL LANGUAGE. | LJT | .7 | 199.50 |
| 10/25/93 | REVISE CASH COLLATERAL LANGUAGE. | LJT | .8 | 228.00 |
| 10/25/93 | TELEPHONE CALL TO ROBERT SHAPIRO RE: CASH COLLATERAL. | LJT | .1 | 28.50 |
| 10/25/93 | TELEPHONE CALL TO IVAN KROUK TO DISCUSS PLANT CASH COLLATERAL. | LJT | .4 | 114.00 |
| 10/25/93 | REVIEW MATERIALS IN CONNECTION WITH THE USE OF CASH COLLATERAL STIPULATION PROVIDED AND THE APPROVAL OF LEASES. | LJT | .4 | 114.00 |
| 11/01/93 | PREPARE MOTIONS TO APPROVE LEASES. | LJT | .3 | 85.50 |
| 11/01/93 | DRAFT MOTION TO APPROVE LEASES. | LJT | .1 | 28.50 |
| 11/02/93 | DRAFT MOTIONS TO APPROVE NEW LEASES FOR PROPERTY. | LJT | .3 | 85.50 |
| 11/03/93 | TELEPHONE CALL TO ROBERT SHAPIRO RE: NEW LEASES. | LJT | .2 | 57.00 |
| 11/03/93 | TELEPHONE CALL TO IVAN KROUK RE: NEW LEASES. | LJT | .1 | 28.50 |
| 11/12/93 | TELEPHONE CALL TO L. PASCHMAN AND ROBERT SHAPIRO REPRESENTING MORTGAGEES RE: LEASES. | LJT | .3 | 85.50 |
| 11/12/93 | ANALYSIS OF CASH COLLATERAL AND LEASE ISSUES. | LJT | .8 | 228.00 |
| 11/12/93 | LETTER TO ROBERT SHAPIRO, COUNSEL TO FIRST MORTGAGEE RE: LEASE ISSUES. | LJT | .2 | 57.00 |
| 11/16/93 | LETTER TO ROBERT SHAPIRO AND L. PASSMAN RE: LEASE APPROVAL AND CASH COLLATERAL. | LJT | .8 | 228.00 |
| 11/16/93 | TELEPHONE CALL TO IVAN KROUK RE: LEASE APPROVAL AND CASH COLLATERAL. | LJT | .2 | 57.00 |
| 11/16/93 | TELEPHONE CALL TO ROBERT SHAPIRO RE: LEASE APPROVAL. | LJT | .2 | 57.00 |
| 11/16/93 | PREPARE FOR HEARING ON LEASE APPROVAL. | LJT | 1.8 | 513.00 |
| 11/17/93 | ATTENDED HEARING ON MOTION TO LEASE PROPERTY. | LJT | 1.2 | 342.00 |
| 11/18/93 | MEET WITH CLIENTS TO PREPARE FOR SECTION 341 MEETING. | LJT | 1.0 | 285.00 |
| 11/18/93 | PREPARE FOR SECTION 341 MEETING. | LJT | .4 | 114.00 |
| 11/18/93 | REVIEW AMENDMENTS TO SCHEDULES PRESENTED BY CLIENT. | LJT | .8 | 228.00 |

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31,1994
A CHAPTER 11

| | | | | |
|---|---|---|---|---|
| | COLLATERAL STIPULATION BEING PREPARED BY MALL AT ONE GROUP. | | | |
| 6/01/94 | ATTEND DISCLOSURE STATEMENT HEARING AND CONTINUED USE OF CASH COLLATERAL. | LJT | .9 | 256.50 |
| 6/01/94 | MEETING AT COURTHOUSE WITH THE ATTORNEYS FOR THE VARIOUS CREDITORS RE: THE DISCLOSURE STATEMENT AND CASH COLLATERAL. | LJT | .6 | 171.00 |
| 6/01/94 | PREPARE FOR THE HEARING ON CASH COLLATERAL AND REVIEW OF THE STIPULATION PERTAINING TO USE OF CASH COLLATERAL. | LJT | .9 | 256.50 |
| 6/01/94 | REVISE VARIOUS ELEMENTS OF THE DISCLOSURE STATEMENT. | LJT | .3 | 85.50 |
| 6/01/94 | REVIEW THE COMMENTS FROM COUNSEL FOR ING BANK RE: THE DISCLOSURE STATEMENT. | LJT | .6 | 114.00 |
| 6/02/94 | REVISE DISCLOSURE STATEMENT. | LJT | .7 | 199.50 |
| 6/03/94 | REVIEW AND FINALIZE CASH COLLATERAL STIPULATION | LJT | .3 | 85.50 |
| 6/06/94 | REVIEW THE NON-DISTURBANCE AGREEMENT FOR ANNIE SEZ. | LJT | .1 | 28.50 |
| 6/06/94 | REVISE THE DISCLOSURE STATEMENT. | LJT | .6 | 171.00 |
| 6/08/94 | REVIEW NON-DISTURBANCE AGREEMENT. | LJT | .2 | 57.00 |
| 6/07/94 | REVISE DISCLOSURE STATEMENT. | LJT | 1.9 | 541.50 |
| 6/08/94 | REVIEW THE 1111(B) ELECTION FILED BY MALL AT ONE GROUP. | LJT | .3 | 85.50 |
| 6/08/94 | REVIEW VARIOUS ISSUES RAISED BY BANK OF NEW YORK. | LJT | .2 | 57.00 |
| 6/09/94 | REVIEW VARIOUS CASH COLLATERAL ISSUES. | LJT | .2 | 57.00 |
| 6/10/94 | REVISE THE DISCLOSURE STATEMENT. | LJT | .9 | 256.50 |
| 6/10/94 | TELEPHONE CONVERSATION WITH IVAN KROUK RE: GROUP 1111(B) ACTION. | LJT | .2 | 57.00 |
| 6/13/94 | REVISE THE DISCLOSURE STATEMENT. | LJT | 1.6 | 456.00 |
| 6/16/94 | REVIEW AND REVISE DISCLOSURE STATEMENT. | LJT | .6 | 171.00 |
| 6/17/94 | REVIEW MATTERS IN CONNECTION WITH THE DISCLOSURE STATEMENT. | LJT | .6 | 171.00 |
| 6/17/94 | REVIEW CHANGES TO THE DISCLOSURE STATEMENT. | LJT | .8 | 228.00 |
| 6/17/94 | TELEPHONE CONVERSATION WITH JOHN ADDERLY RE: VARIOUS ITEMS THAT WILL BE NECESSARY TO SATISFY OBJECTIONS TO THE DISCLOSURE STATEMENT. | LJT | .2 | 57.00 |
| 6/22/94 | REVIEW THE VARIOUS ISSUES IN CONNECTION WITH THE CASH COLLATERAL STIPULATION. | LJT | .2 | 57.00 |
| 6/22/94 | REVIEW THE REVISIONS TO THE DISCLOSURE STATEMENT. | LJT | 1.4 | 399.00 |
| 6/24/94 | TELEPHONE CONVERSATION WITH REPRESENTATIVES OF THE VASTGOED FOOD. | LJT | .4 | 114.00 |

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31,1994
A CHAPTER 11

MALL AT ONE ASSOCIATES, L.P.
222 WEST RITTENHOUSE SQUARE
PHILADELPHIA, PA. 19103

| Date | Services | Atty | Hours | Value |
|---|---|---|---|---|
| 11/02/93 | REVIEW MANGANO LEASE. | DCS | .8 | 96.00 |
| 11/02/93 | REVIEWED D'ANGELO LEASE. | DCS | .8 | 96.00 |
| 11/02/93 | DRAFTED MOTION FOR AUTHORITY TO ENTER INTO D'ANGELO LEASE. | DCS | 1.1 | 132.00 |
| 11/02/93 | DRAFTED MOTION FOR EXPEDITED CONSIDERATION OF D'ANGELO LEASE MOTION. | DCS | .9 | 108.00 |
| 11/02/93 | REVISED MOTION FOR AUTHORITY TO ENTER INTO D'ANGELO LEASE. | DCS | .7 | 84.00 |
| 11/02/93 | REVISED EXPEDITED MOTION TO ENTER INTO D'ANGELO LEASE. | DCS | .5 | 60.00 |
| 11/02/93 | CONTINUE TO REVISE EXPEDITED MOTION TO ENTER INTO D'ANGELO LEASE. | DCS | .4 | 48.00 |
| 11/02/93 | CONTINUE TO REVISE EXPEDITED MOTION TO ENTER INTO D'ANGELO LEASE. | DCS | .3 | 36.00 |
| 11/02/93 | DRAFTED MOTION FOR AUTHORITY TO ENTER INTO MANGANO LEASE. | DCS | .9 | 108.00 |
| 11/02/93 | REVISED MOTION TO ENTER INTO MANGANO LEASE. | DCS | .6 | 72.00 |
| 11/03/93 | SERVED NOTICE OF HEARING ON AUTHORITY TO ASSUME LEASE. | DCS | .8 | 96.00 |
| 11/03/93 | FILED CERTIFICATE OF SERVICE RE: NOTICE OF HEARING ON AUTHORITY TO ASSUME LEAVE. | DCS | .3 | 36.00 |
| 11/03/93 | TELEPHONE CALL FROM IVAN KROOK RE: HEARING ON LEASE. | DCS | .4 | 48.00 |
| 11/17/93 | MEETING WITH IVAN KROOK AND JOHN ADDERLY RE: 341 MEETING. | DCS | 1.1 | 132.00 |
| 11/18/93 | TELEPHONE CALL TO JOHN ADDERLY REGARDING AMENDMENT TO SCHEDULES. | DCS | .3 | 36.00 |
| 11/18/93 | AMENDED SCHEDULES. | DCS | 2.8 | 336.00 |
| 11/18/93 | DRAFTED NOTICE OF 1007.1 DOCUMENT AMENDMENT. | DCS | .4 | 48.00 |
| 11/18/93 | REVISED NOTICE OF 1007.1 DOCUMENT AMENDMENT. | DCS | .3 | 36.00 |
| 11/18/93 | DRAFTED CERTIFICATE OF SERVICE OF NOTICE | DCS | .2 | 24.00 |

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31,1994
A CHAPTER 11

| Date | Services | Atty | Hours | Value | |
|------|----------|------|-------|-------|---|
| 6/10/94 | REVIEWED OBJECTIONS OF BANK OF NEW YORK AND GROUP. | DCS | 1.1 | 132.00 | P |
| 6/11/94 | REVIEWED DISCLOSURE STATEMENT FOR TREATMENT OF CLAIM OF ING BANK AND OBJECTIONS. | DCS | 2.2 | 264.00 | P |
| 6/13/94 | REVISED DISCLOSURE STATEMENT. | DCS | 2.8 | 336.00 | P |
| 6/13/94 | PHONE CALL TO JOHN ADDERLY RE: INFORMATION FOR DISCLOSURE. | DCS | .3 | 36.00 | P |
| 6/14/94 | CONTINUED MAKING REVISIONS TO DISCLOSURE STATEMENT. | DCS | .8 | 96.00 | P |
| 6/15/94 | REVISED DISCLOSURE STATEMENT AND PREPARED SAME FOR FILING. | DCS | 3.2 | 384.00 | P |
| 6/15/94 | PHONE CALL WITH JOHN ADDERLY RE: NON-DISTURBANCE AGREEMENT. | DCS | .3 | 36.00 | L/Annly fez |
| 6/16/94 | PHONE CALL TO MATTHEW SUSTY RE: NON-DISTURBANCE AGREEMENT REF ANNIE SEE. | DCS | .2 | 24.00 | L/Annly fez |
| 6/22/94 | REVIEWED 9019 NOTICE DRAFTED BY CLERK. | DCS | .4 | 48.00 | |
| 6/24/94 | REVIEWED VASTGOED'S AMENDED OBJECTION TO DISCLOSURE. | DCS | .7 | 84.00 | |
| 6/24/94 | PHONE CALL TO JAMIE O'NEILL RE: OBJECTION TO DISCLOSURE STATEMENT. | DCS | .3 | 36.00 | |
| 6/29/94 | DRAFTED SECOND AMENDED DISCLOSURE STATEMENT, FILED AND SERVED SAME. | DCS | 1.6 | 192.00 | P |
| 7/05/94 | RECEIVED PLAN DEADLINES AND PREPARED BALLOTS AND ORDER FOR FILING. | DCS | .8 | 96.00 | |
| 7/21/94 | REFILED NOTICE OF CASH COLLATERAL STIPULATION. | DCS | .5 | 60.00 | CC |
| 7/28/94 | PHONE CALL FROM TONY SHASHOTI RE: OPERATING REPORTS. | DCS | .3 | 36.00 | |
| 7/28/94 | TELEPHONE CALL TO DOUG CANDEUB RE: OPERATING REPORTS. | DCS | .2 | 24.00 | |
| 8/01/94 | REVIEWED MOTION TO COMPEL DISCOVERY FROM VASTGOED. | DCS | .7 | 84.00 | |
| 8/03/94 | ATTENDED HEARING ON MOTION TO COMPEL VASTGOED TO PRODUCE DOCUMENTS. | DCS | 2.8 | 336.00 | |
| 8/03/94 | DRAFTED NOTICES OF DEPOSITION. | DCS | 1.2 | 144.00 | |
| 8/03/94 | CONFERENCE CALL WITH NEIL RODIN AND IVAN KROUK RE: PLAN. | DCS | .3 | 36.00 | P |
| 8/03/94 | TELEPHONE CALL TO JOE EGAN RE: RETAINING HIM AS EXPERT. | DCS | .1 | 12.00 | |
| 8/11/94 | ......... TO DISMISS DEBTOR'S BANKRUPTCY. | DCS | 1.3 | 156.00 | |
| 8/12/94 | REVISED AND FILED MOTION TO DISMISS. | DCS | 2.3 | 276.00 | |

P1179 MALL AT ONE ASSOCIATES, L.P. As of AUG 31,1994
A CHAPTER 11

MALL AT ONE ASSOCIATES, L.P.
222 WEST RITTENHOUSE SQUARE
PHILADELPHIA, PA. 19103

| Date | Services | Atty | Hours | Value |
|------|----------|------|-------|-------|
| 10/25/93 | TELEPHONE CALL WITH CLERK'S OFFICE RE: NOTICE OF COMMENCEMENT OF CASE UNDER CHAPTER 11. | DCC | .2 | 17.00 |
| 10/25/93 | TELEPHONE CALL WITH CLERK'S OFFICE CONFIRMING RE: SERVICE OF CASE UNDER CHAPTER 11. | DCC | .1 | 8.50 |
| ~~11/~~ | ~~PREPARED TRIAL NOTEBOOK AND DOCUMENTS FOR HEARING ON LEASE APPROVAL.~~ | DCC | 3.4 | 289.00 |
| 11/17/93 | MEETING WITH LAWRENCE J. TABAS TO DISCUSS SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS. | DCC | .2 | 17.00 |
| 11/17/93 | TRAVEL TO BANKRUPTCY COURT TO REVIEW FILE, OBTAIN COPIES OF PETITION AND SIGNATURE PAGE OF SCHEDULES. | DCC | 1.5 | 127.50 |
| 11/17/93 | DISCUSSION WITH LAWRENCE J. TABAS, ESQUIRE RE: STATUS OF MALL AND AT ONE: AMENDING SCHEDULES. | DCC | .3 | 25.50 |
| 11/18/93 | ASSISTED DAVID C. SHUTER IN PREPARING FOR 341 MEETING. | DCC | .2 | 17.00 |
| 11/18/93 | PREPARED NOTICE OF AMENDMENT TO ADDITIONAL DOCUMENT REQUIRED IN CHAPTER 11 CASES FOR SERVICE ON ALL PARTIES. | DCC | .8 | 68.00 |
| 11/29/93 | PREPARED AND FILED CERTIFICATE OF SERVICE RE: NOTICE OF ADDITIONAL DOCUMENT IN CHAPTER 11 CASE. | DCC | .3 | 25.50 |
| 1/27/94 | TELEPHONE CALL WITH JOHN ADDERLY RE: OPERATING REPORT. | DCC | .2 | 17.00 |
| 1/27/94 | LETTER TO JOHN ADDERLY RE: OPERATING REPORTS. | DCC | .3 | 25.50 |
| 2/01/94 | REVIEW OF ORDER SCHEDULING DEADLINE TO FILE PLAN AND DISCLOSURE STATEMENT. | DCC | .1 | 8.50 |
| 2/01/94 | REVIEW AND SUMMARIZE CORRESPONDENCE. | DCC | .2 | 17.00 |
| 2/04/94 | TELEPHONE DISCUSSIONS WITH JOHN ADDERLY | DCC | .3 | 25.50 |

1000

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31, 1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value |
|------|----------|------|-------|-------|
| 1/13/95 | UPDATE SERVICE LIST WITH NEW ADDRESSES OF CREDITORS. | MAK | .2 | 15.00 |
| 1/23/95 | ASSIST WITH SERVICE OF EMERGENCY MOTION. | MAK | 1.0 | 75.00 |
| 1/23/95 | TELEPHONE CALL TO J. ADDERLY RE: ADDRESSES FOR SERVICE OF MOTION. | MAK | .2 | 15.00 |
| 1/23/95 | PREPARE FEDERAL EXPRESS LABELS AND HAND DELIVERY SLIP FOR SERVICE OF EXPEDITED MOTION TO ASSUME UNEXPIRED LEASES. | MAK | .8 | 60.00 |
| 1/30/95 | GATHER DOCUMENTATION FOR DAVID SHUTER, ESQUIRE'S HEARING. | MAK | .8 | 60.00 |
| | TOTAL HOURS | | 20 | |

*Lease Assumption*

TOTAL SERVICES.............................$

# APPENDIX B

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

POST-CONFIRMATION FOLLOW UP ISSUES.

| Date | Description | | | |
|------|-------------|------|------|--------|
| 1/12/95 | REVIEW DRAFTS OF A PROPOSED ORDER OF CONFIRMATION. | LJT | .2 | 50.00 |
| 1/12/95 | REVIEW ISSUES IN CONNECTION WITH THE MOTION FILED TO HAVE THE CITY CHANGE ITS VOTE. | LJT | .3 | 75.00 |
| 1/16/95 | CONVERSATION WITH NEAL RODIN, IVAN KROUK REGARDING CONFIRMATION. | LJT | .3 | 75.00 |
| 1/16/95 | CONVERSATION WITH DOUG CANDEUB REGARDING THE CONFIRMATION ORDER. | LJT | .1 | 25.00 |
| 1/16/95 | REVIEW VARIOUS ISSUES RELATING TO THE CONFIRMATION ORDER. | LJT | .2 | 50.00 |
| 1/17/95 | PREPARE FOR THE HEARING ON CONFIRMATION. | LJT | 1.3 | 325.00 |
| 1/17/95 | ATTEND THE HEARING ON CONFIRMATION. | LJT | 3.9 | 975.00 |
| 1/19/95 | CONVERSATION WITH IVAN KROUK AND NEAL RODIN TO DISCUSS THE ORDER OF CONFIRMATION. | LJT | .3 | 75.00 |
| 1/19/95 | REVIEW THE ORDER OF CONFIRMATION. | LJT | .2 | 50.00 |
| 1/23/95 | CONVERSATION WITH DAVID POLLOCK RE: CONFIRMATION ORDER. | LJT | .1 | 25.00 |
| 1/23/95 | CONVERSATION WITH JOHN ADDERLY RE: CONFIRMATION ORDER. | LJT | .1 | 25.00 |
| 1/23/95 | REVIEW THE STATUS OF THE CONFIRMATION AND THE CLOSING ON THE SALE. | LJT | .3 | 75.00 |
| 1/24/95 | CONVERSATION WITH IVAN AND NEAL REGARDING THE CLOSING. | LJT | .3 | 75.00 |
| 1/24/95 | CONVERSATION WITH MORT BRANZBURG. | LJT | .1 | 25.00 |
| 1/24/95 | REVIEW THE LETTER FROM BOB SHAPIRO REGARDING THE BANK'S FEES | LJT | .2 | 50.00 |
| 1/24/95 | CONVERSATION WITH DAVID POLLOCK REGARDING THE CLOSING. | LJT | .3 | 75.00 |
| 1/25/95 | REVIEW THE CLOSING CHECK LIST. | LJT | .1 | 25.00 |
| 1/31/95 | ATTEND THE HEARING ON THE MOTION TO APPROVE THE ASSUMPTION ASSIGNMENT OF LEASES. | LJT | 1.0 | 250.00 |
| 1/31/95 | CONVERSATION WITH THE VARIOUS CREDITORS REGARDING A POTENTIAL SETTLEMENT OF THE CLOSING. | LJT | .4 | 100.00 |
| 2/09/95 | CONVERSATION WITH MORT BRANZBURG AND DOUG CANDEUB REGARDING THE SALE OF THE PROPERTY. | LJT | .4 | 100.00 |
| 2/10/95 | CONVERSATION WITH JERRY BATOFF TO DISCUSS THE SALE OF THE PROPERTY. | LJT | .3 | 75.00 |
| 2/14/95 | CONVERSATION WITH NEAL RODIN AND IVAN KROUK REGARDING A SALE OF THE PROPERTY. | LJT | .2 | 50.00 |
| 2/15/95 | CONVERSATION WITH NEAL RODIN REGARDING THE MOTION TO CONVERT FILED BY THE BANK OF NEW YORK. | LJT | .2 | 50.00 |

1002

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value | |
|------|----------|------|-------|-------|---|
| 2/15/95 | REVIEW THE MOTION TO CONVERT FILED BY THE BANK OF NEW YORK. | LJT | .2 | 50.00 | A/C |
| 2/17/95 | LETTER TO MORT BRANZBURG RE: CITY LETTER. | LJT | .1 | 25.00 | |
| 2/22/95 | PREPARE FOR THE HEARING IN CONNECTION WITH THE REQUESTED MODIFIED PLAN INFORMATION ORDER. | LJT | .6 | 150.00 | |
| 2/22/95 | HEARING IN CONNECTION WITH THE PLAN CONFIRMATION ORDER REQUEST. | LJT | 1.2 | 300.00 | |
| 2/22/95 | LETTER TO NEAL RODIN REGARDING THE POSSIBILITY OF A CONTINUED SALE. | LJT | .3 | 75.00 | |
| 2/23/95 | LETTER FROM MORT BRANZBURG. | LJT | .1 | 25.00 | A |
| 2/23/95 | LETTER TO MORT BRANZBURG RE: APPLICATION MODIFIED PLAN REQUEST. | LJT | .1 | 25.00 | A |
| 2/24/95 | CONVERSATION WITH IVAN KROUK RE: APPLICATION MODIFIED PLAN REQUEST. | LJT | .3 | 75.00 | A |
| 2/26/95 | LETTER TO MORT BRANZBURG. | LJT | .2 | 50.00 | A/C |
| 2/27/95 | PREPARE FOR THE HEARING ON THE MOTION OF THE BANK OF NEW YORK TO CONVERT THE CASE OR TO APPOINT A TRUSTEE. | LJT | .7 | 175.00 | A/C |
| 2/28/95 | PREPARE FOR THE HEARING ON THE MOTION OF BANK OF NEW YORK TO CONVERT OR DISMISS. | LJT | 1.3 | 325.00 | A/C |
| 2/28/95 | MEET WITH IVAN KROUK TO PREPARE HIM FOR THE HEARING IN CONNECTION WITH THE MOTION TO CONVERT. | LJT | .7 | 175.00 | A/C |
| 3/01/95 | ATTEND THE HEARING IN CONNECTION WITH THE AUCTION OF THE PROPERTY AND MOTION TO CONVERT. | LJT | 3.9 | 975.00 | A |
| 3/01/95 | PREPARE FOR THE HEARING ON THE AUCTION AND THE MOTION TO CONVERT. | LJT | 1.3 | 325.00 | A |
| 3/01/95 | FOLLOW UP DISCUSSION WITH NEAL RODIN AND IVAN KROUK RE: THE AUCTION. | LJT | .6 | 150.00 | A |
| 3/01/95 | REVIEW THE AUCTION AGREEMENT. | LJT | .6 | 150.00 | A |
| 3/01/95 | CONVERSATIONS WITH DOUG CANDEUB RE: THE AUCTION. | LJT | .1 | 25.00 | A |
| 3/07/95 | REVIEW THE AUCTION PROCEDURES. | LJT | .3 | 75.00 | A |
| 3/09/95 | TELEPHONE CALL TO ROBERT SHAPIRO. | LJT | .1 | 25.00 | |
| 3/09/95 | REVIEW THE AGREEMENT WITH THE AUCTIONNER. | LJT | .2 | 50.00 | A |
| 3/09/95 | CONVERSATION WITH MORT BRANZBURG RE: A SALE. | LJT | .1 | 25.00 | A |
| 3/09/95 | CONVERSATION WITH IVAN KROUK. | LJT | .1 | 25.00 | |
| 3/09/95 | LETTER TO IVAN KROUK RE: THE AUCTION. | LJT | .2 | 50.00 | A |
| 3/24/95 | CONVERSATION WITH NEAL RODIN AND IVAN KROUK REGARDING THE AUCTION SALE. | LJT | .4 | 100.00 | A |

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value | |
|------|----------|------|-------|-------|---|
| 3/24/95 | REVIEW THE AGREEMENT OF SALE PROPOSED BY TRAINHAN AND BANK OF NEW YORK. | LJT | .3 | 75.00 | A |
| 3/28/95 | PREPARE FOR THE HEARING IN CONNECTION WITH THE STATUS REPORT ON THE AUCTION. | LJT | .7 | 175.00 | A |
| 3/28/95 | CONVERSATION WITH MARK CLLEHM RE: THE AUCTION. | LJT | .2 | 50.00 | A |
| 3/28/95 | CONVERSATION WITH MORT BRANZBURG. | LJT | .1 | 25.00 | Appeal |
| 3/28/95 | CONVERSATION WITH DOUG CANDEUB RE: BRIEF. | LJT | .2 | 50.00 | |
| 3/29/95 | ATTEND THE HEARING IN CONNECTION WITH THE STATUS. | LJT | 2.2 | 550.00 | A 1/2 A |
| 4/04/95 | REVIEW MATERIALS IN CONNECTION WITH THE UPCOMING HEARING ON THE AUCTION SALE. | LJT | .6 | 150.00 | A |
| 4/05/95 | REVIEW MATERIALS IN CONNECTION WITH THE AUCTION SALE OF THE PROPERTY. | LJT | .3 | 75.00 | A |
| 4/05/95 | DRAFT EMERGENCY MOTION TO HAVE A PRIVATE SALE APPROVED FOR THE AUTCTION OF THE PROPERTY. | LJT | 2.2 | 550.00 | |
| 4/06/95 | REVIEW THE SERVICE OF THE MOTION REGARDING THE EMERGENCY HEARING FOR THE PRIVATE SALE OF THE PROPERTY. | LJT | .6 | 150.00 | |
| 4/06/95 | CONVERSATION WITH MORT BRANZBURG RE: THE EMERGENCY MOTION RE: PRIVATE SALE. | LJT | .2 | 50.00 | |
| 4/06/95 | CONVERSATION WITH DOUG CANDEUB RE: THE EMERGENCY MOTION RE: PRIVATE SALE. | LJT | .2 | 50.00 | |
| 4/06/95 | CONVERSATION WITH MARK CLEHM RE: THE EMERGENCY MOTION RE: PRIVATE SALE. | LJT | .2 | 50.00 | |
| 4/06/95 | CONVERSATION WITH A POTENTIAL BIDDER. | LJT | .3 | 75.00 | |
| 4/06/95 | CONVERSATION WITH HERNAN FALA, KEN BEHLIN RE: EMERGENCY HEARING; CONVERSATION WITH LEONARD GOLDBERGER TO DISCUSS THE SAME. | LJT | .2 | 50.00 | |
| 4/06/95 | CONVERSATION WITH NEIL RODIN TO DISCUSS THE EMERGENCY HEARING. | LJT | .2 | 50.00 | |
| 4/07/95 | CONVERSATION WITH COUNSEL FOR A POTENTIAL BIDDER AT THE AUCTION. | LJT | .2 | 50.00 | |
| 4/07/95 | PREPARE FOR THE HEARING ON THE EMERGENCY MOTION OF MALL AT ONE. | LJT | 1.3 | 325.00 | |
| 4/07/95 | CONVERSATION WITH LEONARD GOLDBERGER RE: THE EMERGENCY HEARING. | LJT | .2 | 50.00 | |
| 4/07/95 | LETTER TO DOUG CANDEUB AND MORT BRANZBURG TO DISCUSS THE PRIVATE SALE VS. AN AUCTION SALE. | LJT | .4 | 100.00 | A |
| 4/07/95 | TELEPHONE CONVERSATION WITH NEIL RODIN RE: THE AUCTION. | LJT | .2 | 50.00 | |

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31, 1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value |
|------|----------|------|-------|-------|
| 4/07/95 | ATTEND THE HEARING ON THE EMERGENCY MOTION. | LJT | 1.6 | 400.00 |
| 4/11/95 | DISCUSS WITH DAVID SHUTER AND NEIL RODIN THE RESULTS OF THE AUCTION SALE. | LJT | .6 | 150.00 |
| 4/11/95 | LETTER TO DOUG CANDEUB RE: HIS LETTER PERTAINING TO CHANGES TO THE AUCTION SALE AGREEMENT. | LJT | .2 | 50.00 |
| 4/11/95 | MEET WITH JEFF BATOFF; MARK LUBLIN, NEIL RODIN AND IVAN KROUK TO DISCUSS POTENTIAL CLAIMS AGAINST THE BANK OF NEW YORK AND MALL AT ONE GROUP WITH RESPECT TO THE AUCTION SALE OF THE PROPERTY, THEIR CONDUCT DURING THE CHAPTER 11, THE LIABILITY FOR THE CITY TAXES AND THE PLAN OF REORGANIZATION. | LJT | 5.9 | 1,475.00 |
| 4/12/95 | ATTEND HEARING IN CONNECTION WITH THE AUCTION SALE OF THE PLAN. | LJT | 1.2 | 300.00 |
| 4/12/95 | CONVERSATION WITH NEIL RODIN TO DISCUSS STRATEGY. | LJT | .3 | 75.00 |
| 4/12/95 | REVIEW 506(C) LITIGATION POTENTIAL. | LJT | .4 | 100.00 |
| 4/14/95 | LETTER TO AND FROM DOUG CANDEUB RE: CASH COLLATERAL. | LJT | .1 | 25.00 |
| 4/14/95 | CONVERSATION WITH LENNY GOLDBERGER RE: CASH COLLATERAL. | LJT | .1 | 25.00 |
| 4/14/95 | REVIEW AND MAKE CHANGES TO THE CASH COLLATERAL STIPULATION. | LJT | .2 | 50.00 |
| 4/17/95 | REVIEW THE VARIOUS POTENTIAL POST-AUCTION MOTIONS AVAILABLE TO THE DEBTOR AND OTHER PARTIES. | LJT | .3 | 75.00 |
| 4/18/95 | REVIEW VARIOUS RECENT CORRESPONSECE FROM THE AUCTIONEER AND OTHERS REGARDING THE SALE OF THE PROPERTY AND DISCUSSIONS WITH LENNY GOLDBERGER RE: THE AUTCTION SALE. | LJT | .2 | 50.00 |
| 4/18/95 | PREPARE A 506(C) MOTION. | LJT | .4 | 100.00 |
| 4/19/95 | CONVERSATION WITH LENNY GOLDBERGER TWICE WHAT ACTIONS HIS CLIENT MAY TAKE IN CONNECTION WITH THE AUCTION SALE OF THE PROPERTY. | LJT | .2 | 50.00 |
| 4/19/95 | CONVERSATION WITH NEAL RODIN TO DISCUSS WITH HIM THE AUCTION SALE OF THE PROPERTY AND THE ACTIONS OF THE BANK OF NEW YORK AND APPROVING THE SALE TO MALL AT ONE GROUP. | LJT | .2 | 50.00 |
| 4/19/95 | REVIEW LETTERS FROM DOUG CANDEUB RE: THE | LJT | .2 | 50.00 |

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value | |
|------|----------|------|-------|-------|---|
| 12/09/94 | DRAFTED BALLOT. | DCS | 1.1 | 143.00 | P |
| 12/09/94 | SERVED PLAN, DISCLOSURE, BALLOT, ORDER APPROVING DISCLOSURE AND MODIFICATION. | DCS | 1.7 | 221.00 | P |
| 12/19/94 | REVISED PLAN, REMOVED BLACKLINING AND SENT TO DAN CANDEUB. | DCS | 1.5 | 195.00 | P |
| 12/20/94 | PHONE CALL TO IVAN KROUK RE AUCTIONEER. | DCS | .3 | 39.00 | Sale |
| 12/22/94 | REVIEWED AGREEMENT OF SALE. | DCS | 1.1 | 143.00 | A |
| 12/22/94 | PHONE CALL FROM DOUG CANDEUB RE AUCTION. | DCS | .2 | 26.00 | Sale |
| 12/22/94 | PHONE CALL FROM IVAN KROUK RE AGREEMENT. | DCS | .3 | 39.00 | Sale |
| 1/04/95 | REVIEWED PORTION OF AGREEMENT OF SALE SENT BY IVAN KROUK. | DCS | .5 | 65.00 | Sale |
| 1/04/95 | PHONE CALL TO DOUG CANDEUB RE AMENDING PLAN AND TAX ISSUE. | DCS | .3 | 39.00 | P/T |
| 1/05/95 | DRAFTED AMENDMENTS TO PLAN PER AGREEMENT OF SALE. | DCS | 2.4 | 264.00 | Sale |
| 1/05/95 | REVIEWED COMPLETE VERSION OF AGREEMENT OF SALE. | DCS | 1.3 | 143.00 | Sale |
| 1/05/95 | DRAFTED APPLICATION TO EMPLOY AUCTIONEER. | DCS | 2.7 | 297.00 | A |
| 1/06/95 | REVIEW ISSUES RE: CONFIRMATION OF PLAN. | DCS | 1.8 | 198.00 | P |
| 1/06/95 | CONTACTED TRAIMAN ER: RETENTION BY DEBTOR AND REVIEWED LISTING K. | DCS | .9 | 99.00 | A |
| 1/06/95 | REVIEW BALLOTS RECEIVED AND SENT GENERAL PARTNER BALLOT TO VOTE. | DCS | 1.3 | 143.00 | P |
| 1/06/95 | REVIEW AGREEMENT OF SALE FOR PLAN CHANGES. | DCS | 1.1 | 121.00 | P |
| 1/06/95 | CONFERENCE CALL WITH DOUG CANDEUB AND PATRICIA A TRAIMAN. | DCS | .5 | 55.00 | A |
| 1/09/95 | DRAFTED MOTION TO EMPLOY BROKER. | DCS | 1.3 | 143.00 | |
| 1/09/95 | REVISED MOTION TO EMPLOY AUCTIONEER. | DCS | .6 | 66.00 | A |
| 1/09/95 | PHONE CALL TO DOUG CANDEUB RE: CONFIRMATION ISSUES. | DCS | .6 | 66.00 | P |
| 1/09/95 | PREPARATION FOR CONFIRMATION HEARING. | DCS | 2.3 | 253.00 | P |
| 1/09/95 | PHONE CALL FROM IVAN KROUK RE: TAXES AND SETTLEMENT. | DCS | .4 | 44.00 | T |
| 1/10/95 | REVISED AND FILED APPLICATION TO EMPLOY TRAIMAN AS AUCTIONEER. | DCS | 1.7 | 187.00 | A |
| 1/10/95 | REDRAFTED AND FILED APPLICATION TO EMPLOY RODIN ENTERPRISES AS BROKER. | DCS | 2.6 | 286.00 | |
| 1/10/95 | CONFERENCE CALL WITH LAWRENCE J. TABAS, ADDERLY AND RODIN. | DCS | .6 | 66.00 | |
| 1/10/95 | CONFERENCE CALL WITH BRANZBURG, SHAPIRO, CANDEUB AND LAWRENCE J. TABAS RE: PLAN. | DCS | .8 | 88.00 | P |
| 1/10/95 | MEETING WITH JOHN ADDERLY AND NEAL RODIN PREPARING FOR HEARING. | DCS | 1.5 | 165.00 | P |

1006

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31, 1995
A CHAPTER 11

| Date | Services | Atty | Hours | Value | |
|------|----------|------|-------|-------|---|
| 1/23/95 | PHONE CALL FROM IVAN KROUK RE: ASSUMPTION OF LEASES. | DCS | .2 | 22.00 | P/Sale |
| 1/24/95 | REVIEWED LETTERS FROM ROBERT SHAPIRO RE: PAYOFF AND AUCTIONEER. | DCS | .6 | 66.00 | A |
| 1/26/95 | PHONE CALL FROM DOUG CANDEUB RE: AUCTIONEER. | DCS | .2 | 22.00 | A |
| 1/30/95 | PREPARED QUESTIONS AND EXHIBITS FOR HEARING RE: ASSUMPTION OF LEASES. | DCS | 3.4 | 374.00 | P/Sale |
| 1/31/95 | PREPARED FOR AND ATTENDED HEARING RE: ASSUMPTION OF LEASES.\ | DCS | 2.9 | 319.00 | P/Sale |
| 1/31/95 | REVISED AND SUBMITTED ORDER RE: ASSUMPTION OF LEASES. | DCS | .7 | 77.00 | P/Sale |
| 1/31/95 | OBTAINED AND CIRCULATED CERTIFIED ORDER AUTHORIZING ASSUMPTION. | DCS | .6 | 66.00 | P/Sale |
| 1/31/95 | MEETING WITH LJT RE: CLOSING ISSUES. | DCS | .6 | 66.00 | P/Sale |
| 2/01/95 | NEGOTIATION WITH IVAN KROUK AND MORTON BRANZBURG RE: CLOSING EXPENSES. | DCS | 1.3 | 143.00 | P/Sale |
| 2/01/95 | NEGOTIATION WITH DOUGLAS CANDEUB AND DAVE POLLACK RE: CLOSING EXPENSES. | DCS | .9 | 99.00 | P/Sale |
| 2/02/95 | REVIEW OF FIGURES FOR CLOSING NEGOTIATED WITH NEW PLAN RE: SAME. | DCS | 2.2 | 242.00 | P/Sale |
| 2/02/95 | OBTAINED AND SENT ORDER ASSUMING LEASES TO NEW PLAN. | DCS | 1.2 | 132.00 | P/Sale |
| 2/03/95 | PHONE CALL TO STEWART PALEY RE: STATUS OF CLOSING. | DCS | .5 | 55.00 | P/Sale |
| 2/03/95 | RESEARCH RE: OBJECTION OF LIMITED PARTNER TO SALE PURSUANT TO PLAN. | DCS | 3.6 | 396.00 | |
| 2/03/95 | PHONE CALL FROM IVAN KROUK RE: ULMAN, LEASING COMMISSION AND OBJECTION TO BANK'S CLAIM. | DCS | 1.2 | 132.00 | |
| 2/07/95 | REVIEWED MOTIONS FOR MODIFICATION OF CONFIRMATION ORDER FILED BY IVAN KROUK. | DCS | 1.1 | 121.00 | P |
| 2/07/95 | TELEPHONE CALL TO DOUG CANDEUB RE: STATUS OF CASE. | DCS | .5 | 55.00 | |
| 2/08/95 | REVIEWED AGREEMENT OF SALE FOR OPINION LETTER. | DCS | .8 | 88.00 | Sale |
| 2/08/95 | TELEPHONE CALL FROM DOUG CANDEUB RE: OPINION LETTER. | DCS | .3 | 33.00 | |
| 2/10/95 | RESEARCH RE: LIMITED PARTNERSHIP AGREEMENTS AND ABILITY TO BIND PARTNERS. | DCS | 2.8 | 308.00 | |
| 2/13/95 | REVIEWED OBJECTION TO BROKER IN PREPARATION FOR HEARING. | DCS | .6 | 66.00 | |
| 2/13/95 | TELEPHONE CALL TO CYNTHIA WHITE RE: | DCS | .1 | 11.00 | T |

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

| Date | Description | | Hours | Amount | |
|------|-------------|---|-------|--------|---|
| | EXTENSION OF DEADLINE TO PAY CITY. | | | | |
| 2/13/95 | TELEPHONE CALL FROM SHARON AT CYNTHIA WHITE'S OFFICE RE: CITY CLAIM. | DCS | .5 | 55.00 | T |
| 2/13/95 | TELEPHONE CALL TO DOUGLAS CANDEUB RE: DISCUSSIONS WITH CITY. | DCS | .2 | 22.00 | T |
| 2/13/95 | DRAFTED LETTER TO CYNTHIA WHITE RE: PROPOSAL TO EXTEND DEADLINE. | DCS | .5 | 55.00 | T |
| 2/14/95 | REVIEWED DESIGNATION OF RECORD, DOCKET AND ISSUES PRESENTED. | DCS | 1.3 | 143.00 | Appeal |
| 2/14/95 | DRAFTED COUNTERDESIGNATION OF RECORD AND ISSUES ON APPEAL. | DCS | 1.2 | 132.00 | Appeal |
| 2/15/95 | DRAFTED AND REVISED COUNTERDESIGNATION OF RECORD ON APPEAL. | DCS | 2.2 | 242.00 | Appeal |
| 2/15/95 | DRAFTED LETTER TO CYNTHIA WHITE RE: SETTLEMENT. | DCS | .4 | 44.00 | T |
| 2/17/95 | REVIEWED DOUG CANDEUB'S LETTERS RE: CITY AGREEMENT. | DCS | .3 | 33.00 | T |
| 2/17/95 | TELEPHONE CALL FROM DOUG CANDEUB RE: CITY LETTERS. | DCS | .2 | 22.00 | T |
| 2/21/95 | TELEPHONE CALL TO IVAN KROUK RE: HEARINGS ON 2/22/95. | DCS | .5 | 55.00 | |
| 2/21/95 | LETTER TO CYNTHIA WHITE RE: SETTLEMENT. | DCS | .5 | 55.00 | T |
| 2/22/95 | TELEPHONE CALL TO PATRICIA DEMAY AT TRAIMAN RE: RETENTION OF AUCTIONEER. | DCS | .2 | 22.00 | A |
| 2/24/95 | REVIEWED, REVISED AND FILED CERTIFICATE OF NO OBJECTION RE: APPLICATION TO EMPLOY AUCTIONEER. | DCS | .8 | 88.00 | A |
| 2/26/95 | DRAFTED RESPONSE TO MOTION TO CONVERT/APPOINTMENT OF TRUSTEE. | DCS | 2.9 | 319.00 | C |
| 2/27/95 | PREPARATION FOR HEARING RE: MOTION TO CONVERT. | DCS | 1.2 | 132.00 | C |
| 2/28/95 | REVISED ANSWER TO BANK OF NEW YORK'S MOTION TO CONVERT/APPOINT TRUSTEE AND FILED. | DCS | 2.1 | 231.00 | C |
| 2/28/95 | PREPARED FOR HEARING RE: BANK OF NEW YORK'S MOTION TO CONVERT/MEETING WITH IVAN KROUK. | DCS | 3.9 | 429.00 | C |
| 2/28/95 | DRAFTED LETTER TO DOUG CANDEUB RE: ORDER EMPLOYING AUCTIONEER. | DCS | .6 | 66.00 | A |
| 2/28/95 | LETTER TO TRAIMAN RE: RETAINING THEM AS AUCTIONEER. | DCS | .7 | 77.00 | A |
| 2/28/95 | LETTER TO TRAIMAN RE: HEARING. | DCS | .3 | 33.00 | A |
| 3/01/95 | PREPARED FOR AND ATTENDED HEARING RE: MOTION TO CONVERT. | DCS | 4.6 | 506.00 | C |
| 3/01/95 | CONFERENCE CALL WITH AUCTIONEER DOUG | DCS | .8 | 88.00 | A |

1008

P1179 MALL AT ONE ASSOCIATES, L.P. As of MAY 31,1995
A CHAPTER 11

| Date | Description | | | |
|---|---|---|---|---|
| | CANDEUB AND ROBERT SHAPIRO. | | | |
| 3/02/95 | PROCURED CERTAIN DOCUMENTS FOR AUCTIONEER. | DCS | .6 | 66.00 |
| 3/02/95 | LETTER TO IVAN KROUK RE: DOCUMENTS NEEDED BY AUCTIONEER. | DCS | .3 | 33.00 |
| 3/27/95 | REVIEWED DOCUMENTATION RE: AUCTION AND ISSUES TO BE RESOLVED. | DCS | 1.3 | 143.00 |
| 3/27/95 | PHONE CALL FROM MARK CLEMM RE: TAXES. | DCS | .4 | 44.00 |
| 3/27/95 | PHONE CALL TO DOUG CANDEUB RE: AUCTION AND BRIEF. | DCS | .5 | 55.00 |
| 3/28/95 | PREPARATION OF MATERIAL FOR STATUS AND CASH COLLATERAL HEARING. | DCS | 1.7 | 187.00 |
| 3/30/95 | LETTER TO DOUG CANDEUB CONFIRMING CONTINUANCE OF BRIEF DEADLINE. | DCS | .4 | 44.00 |
| 3/31/95 | PHONE CALL AND FOLLOW-UP LETTER TO DOUG CANDEUB RE: BRIEF. | DCS | .4 | 44.00 |
| 4/06/95 | REVIEWED FILE FOR CLOSING FIGURES AND SENT TO DOUG CANDEUB. | DCS | .7 | 77.00 |
| 4/07/95 | CONFORMED ORDER RE: EMERGENCY MOTION FOR PRIVATE SALE AND SERVED MOTION AND ORDER. | DCS | 2.7 | 297.00 |
| 4/11/95 | ATTENDED AUCTION OF MALL AT SITE. | DCS | 3.3 | 429.00 |
| 4/12/95 | PREPARED FOR AND ATTENDED HEARING RE: AUCTION RESULTS. | DCS | 3.1 | 403.00 |
| 4/12/95 | WENT TO TRAIMAN'S WITH IVAN KROUK TO GET AGREEMENTS OF SALE AND CHECKS. | DCS | .8 | 104.00 |
| 4/13/95 | PHONE CALL AND REVIEW OF LETTER FROM JOE KESSLER RE: TAX CLAIM SETTLEMENT. | DCS | .4 | 52.00 |
| 4/18/95 | RESEARCH RE: 506(c) STANDARDS AND APPLICATION. | DCS | 2.4 | 312.00 |
| 4/18/95 | DRAFTED 506(c) MOTION. | DCS | 2.3 | 299.00 |
| 4/18/95 | PHONE CALL TO IVAN KROUK RE: 506(c) AND VARIOUS COURT ORDERS. | DCS | .2 | 26.00 |
| 4/18/95 | PHONE CALL TO MARK CLEMM RE: ORDER APPROVING LISTING AGREEMENT. | DCS | .2 | 26.00 |
| 4/19/95 | REVISED 506(c) MOTION. | DCS | 2.3 | 299.00 |
| 4/24/95 | REVISED 506 MOTION. | DCS | .7 | 91.00 |
| 4/27/95 | REVISED 506(c) MOTION. | DCS | 1.2 | 156.00 |
| 5/09/95 | REVIEWED PLEADING AND IVAN KROUK RESPONSE TO INJUNCTION MOTION FOR HEARING. | DCS | 1.3 | 169.00 |
| 5/10/95 | PREPARED FOR AND ATTENDED INJUNCTION TO ENJOIN SALE AND TO COMPEL DEBTOR'S COOPERATION. | DCS | 4.2 | 546.00 |
| 5/10/95 | PHONE CALL FROM JOE KURAK RE: HEARING ON MOTION. | DCS | .5 | 65.00 |
| 5/11/95 | REVIEWED PLAN, GROUP AND BANK OF NEW YORK'S AGREEMENT AND LETTER TO DOUGLAS CANDEUB. | DCS | .8 | 104.00 |

## ORDER

AND NOW, this 3rd day of August, 1995, after a hearing of June 26, 1995, on the Amended Motion of Debtor for Allowance of Claim Pursuant to Section 506(c) of the Code and for an Order Directing Payment of Claim from Secured Parties' Collateral at Closing on Property and/or in the Alternative for a Redistribution of Administrative Expenses Previously Paid, or to Declare Plan to be in Default and Awarding the Debtor Damages for the Breach Thereof ("the Motion"), and upon consideration of the parties' briefs and the Application of Mall at One Group ("Group") to file a reply brief ("the Application"), it is hereby ORDERED AND DECREED as follows:

1. The Application is GRANTED in light of the modesty of the reply brief submitted and the Debtor's opportunity to respond to the Application in its Objection thereto, which we have also considered.

2. The Motion is GRANTED in small part only. The Debtor, per its counsel, Obermayer, Rebmann, Maxwell & Hippel, is awarded recovery of attorney's fees in the total amount of $10,840.50 from Group only under 11 U.S.C. § 506(c).

3. All other relief under 11 U.S.C. § 506(c) sought in the Motion is DENIED. All other relief sought in the Motion is DENIED because it is deemed abandoned.